*Id.* The court further noted that one interpretation of the agreement was "reinforced by the prosecutor's remarks at the sentencing hearing . . . ." *Id. at 359.* In reaching its conclusion, the court noted that it considered "the totality of the circumstances presented here." *Id.*

Thus, under California law, a judicial determination of the parties' expectations in a plea agreement is not confined to reviewing the four corners of the plea agreement. A plea agreement is not like a contract between two private parties. Rather, in a plea agreement, the prosecutor and the defendant agree to make certain representations to the trial judge who retains the authority to accept or reject those representations. *See Frankel v. Bd. of Dental Examiners, 46 Cal. App. 4th 534, 551, 54 Cal. Rptr. 2d 128 (Cal. Ct. App. 1996).* Furthermore, a plea agreement is often, as in this case, before the trial court on at least two occasions at which various factors that have an influence on the agreement and the parties' expectations may be considered. Here, the trial court first considered the plea agreement at the change-of-plea **[\*\*34]** hearing, and subsequently the trial court considered the provisions of the plea agreement when it sentenced Buckley.

A review of the record in this case shows that the state court reasonably determined that Buckley's expectation was that he would receive a 15-years-to-life sentence. [1] As noted in the majority opinion, there is some question as to what language was in the plea agreement when Buckley signed it. The record, however, shows that when Buckley testified in Fauber's trial in January 1988, he stated that he had pled guilty to second-degree murder, with a penalty of 15 years to life, in return for the District Attorney not prosecuting him with murder in the first degree, which carried a penalty of 25 years to life, and dropping the robbery and burglary **[\*702]** charges. Moreover, at his subsequent sentencing hearing in March 1988, the trial court sentenced Buckley to a prison term of 15 years to life and a parole term of life. Buckley was represented by counsel at the sentencing hearing and did not object to the imposed sentence. Furthermore, the attorney who represented Buckley in 1988 subsequently testified that he had no recollection of negotiating a determinant sentence of 15 years **[\*\*35]** with the District Attorney or discussing such a sentence with Buckley. It was not until 1996 that Buckley advanced the contention that his plea agreement was for 15 years. Perhaps reasonable minds may differ on whether Buckley in 1988 knew that his plea agreement was for 15 years to life, but the state court's determination that he did is not "an unreasonable determination of the facts in light of the evidence presented." *See 28 U.S.C. § 2254 (d)(2): see also Taylor, 366 F.3d at 1000* (stating that "it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision;" instead, we must be convinced that the state court "could not reasonably conclude that the finding is supported by the record.").

**FOOTNOTES**

[1] It is true that the California Superior Court did not specify that the plea agreement should be interpreted pursuant to general contract terms. Nonetheless, the application of those terms would not have changed that court's factual determination. Moreover, the state court's factual finding that Buckley well knew that his bargained-for sentence was 15 years to life resolved the ambiguity in the agreement.

**[\*\*36]** Finally, I note that this factual determination is further bolstered by the State's representation -- not rebutted by the majority or by Buckley -- that the allegedly bargained-for sentence of 15 years was illegal under California law. [2] This too, is part of the relevant surrounding circumstances that a court may consider in determining the parties' intent in entering into a plea agreement. There is nothing in the record to suggest that the prosecutor intended or had any motive to agree to such an illegal sentence. Similarly, there is nothing in the record to suggest that the trial judge was not aware of the statutory sentence for second degree murder or that he intended to approve an illegal sentence.

**FOOTNOTES**

[2] For this reason, I also disagree with the majority's holding that Buckley is entitled to specific performance of the plea agreement, as it interprets the agreement. Were I to otherwise agree

with the majority, I would vacate the sentence and give Buckley an opportunity to withdraw his plea; thus placing both sides back in the positions they were in prior to their entry into the plea bargain. This is not to suggest that what has transpired since 1988 would not have a substantial impact on the parties' subsequent actions. Rather, my concern is that a federal court should not order the specific performance of a plea agreement in a state court that is illegal under state law.


[**37]  In this case, the state court -- on the basis of the same evidence as Buckley presented in his federal habeas petition -- determined that Buckley "well knew that the term of imprisonment for which he was to be committed to prison for the crime of second degree murder was 15 years to life." Pursuant to 28 U.S.C. § 2254(d)(2), this factual determination precludes federal habeas relief unless it is "unreasonable." The fact that the state court did not refer to contract law when determining Buckley's understanding of the plea agreement does not make the state court's factual determination unreasonable. Accordingly, I would vacate the district court's grant of Buckley's petition for a writ of habeas corpus, and deny the petition.


Source:  Legal > / . . . / > **Federal & State Cases, Combined** [i]
Terms:  **name(buckley and terhune)**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Saturday, November 10, 2007 - 1:05 PM EST

* Signal Legend:
● -  Warning: Negative treatment is indicated
[Q] -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
❶ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.


Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

 **LexisNexis**®    About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**LexisNexis** *Total Research System*

Search | Research Tasks | Get a Document | Shepard's® | Alerts

History ¦ 🖳

Source: Legal > / . . . / > 9th Circuit - US Court of Appeals Cases & Bankruptcy Appellate Panel ⓘ
Terms: **name(buckley and terhune)** (Edit Search | Suggest Terms for My Search)

✒Select for FOCUS™ or Delivery

☐ ⚠ 1. Buckley v. Terhune, No. 03-55045 , UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT, 441 F.3d 688; 2006 U.S. App. LEXIS 6612, September 27, 2005,
Argued and Submitted, San Francisco, California , March 17, 2006, Filed , US Supreme
Court certiorari denied by, Motion denied by Tilton v. Buckley, 2007 U.S. LEXIS 4501
(U.S., Apr. 23, 2007)
BRIAN A. **BUCKLEY**, Petitioner-Appellee, v. C.A. **TERHUNE**, Director of the  ...

**OVERVIEW:** Habeas relief granted to inmate was affirmed. Under § 2254(d)(1), the
state court's failure to interpret the inmate's plea agreement according to California
contract law resulted in a decision that was contrary to clearly established Supreme
Court law as set forth in Santobello v. New York and Ricketts v. Adamson.

**CORE TERMS:** plea agreements, sentence, years to life, murder, ambiguity, prison,
sentencing, contract law, degree murder, ambiguous ...

☐ Ⓐ 2. Buckley v. Terhune, No. 03-55045 , UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT, 418 F.3d 1003; 2005 U.S. App. LEXIS 15816, August 2, 2005, Filed
BRIAN A. **BUCKLEY,** Petitioner - Appellee, v. C. A. **TERHUNE**, Director of the  ...

☐ ⬤ 3. Buckley v. Terhune, No. 03-55045 , UNITED STATES COURT OF APPEALS FOR THE
NINTH CIRCUIT, 397 F.3d 1149; 2005 U.S. App. LEXIS 1226, January 9, 2004, Argued
and Submitted , Pasadena, California , January 25, 2005, Filed , Rehearing, en banc,
granted by, Vacated by Buckley v. Terhune, 418 F.3d 1003, 2005 U.S. App. LEXIS
15816 (9th Cir., 2005)
BRIAN A. **BUCKLEY,** Petitioner-Appellee, v. C. A. **TERHUNE**, Director of the  ...

**OVERVIEW:** Federal habeas court erred in granting habeas relief to California inmate
where it failed to afford appropriate level of deference to state court's finding that there
was no breach of plea bargain; the state court's finding was not unreasonable.

**CORE TERMS:** sentence, plea agreement, prosecutor, years to life, murder, felony,
evidentiary hearing, sentencing, plea bargain, sentenced ...

☐ ◆ 4. Wade v. Terhune, Nos. 98-16720, 98-16738, UNITED STATES COURT OF APPEALS FOR
THE NINTH CIRCUIT, 202 F.3d 1190; 2000 U.S. App. LEXIS 1279; 2000 Cal. Daily Op.
Service 880; 2000 Daily Journal DAR 1297, June 14, 1999, Argued and Submitted, San
Francisco, California , February 2, 2000, Filed
... Appellant, v. CARL **TERHUNE**, Director; GAIL LEWIS,  ...
... Appellees. PAUL CHRISTOPHER **BUCKLEY**, Petitioner-Appellant, v. CARL **TERHUNE,**
Director; GAIL LEWIS,  ...

**OVERVIEW:** While appellant habeas corpus petitioners' habeas petitions were
considered under the wrong legal standard, their petitions could not be granted since
they did not establish a prima facie case under the standard more favorable to them.

**CORE TERMS:** prima facie case, prosecutor, juror, strong likelihood, peremptory
challenges, reasonable inference, state trial, voir dire, venire, habeas corpus ...

* Signal Legend:
- ● - Warning: Negative treatment is indicated
- Q - Questioned: Validity questioned by citing refs
- △ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- Ⓐ - Citing Refs. With Analysis Available
- ❶ - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

Search | Research Tasks | Get a Document | *Shepard's*® | Alerts
History | Delivery Manager | Switch Client | Preferences | Sign Off | Help

 LexisNexis®

About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



 governance

## Council Resolutions

▶ GOVERNANCE HOMEPAGE

▶ COUNCIL OF REPRESENTATIVES

▶ BOARD OF DIRECTORS

▶ PRESIDENT'S OFFICE

▶ ELECTIONS

▶ BYLAWS

▶ ASSOCIATION RULES (PDF)

▶ COUNCIL POLICY MANUAL

▶ COUNCIL POLICY MANUAL—ARCHIVES

▶ BOARDS & COMMITTEES

▶ APA DIVISIONS

▶ CONSOLIDATED MEETING DATES

**Resolution Against Torture and Other Cruel, Inhuman, and Degrading Treatment or Punishment**

Adopted by APA Council of Representatives, August 9, 2006

That Council adopt the American Psychological Association 2006 Resolution Against Torture and Other Cr Inhuman, and Degrading Treatment or Punishment to replace its 1986 Human Rights Resolution relating to torture as policy of the APA.

WHEREAS the existence of state-sponsored torture and other cruel, inhuman, or degrading treatment or cr inhuman, or degrading punishment has been documented in many nations around the world (e.g.,Genefke 2004; Human Rights Watch, 2006; U.S. Department of State, 2005);

WHEREAS torture victims and victims of other cruel, inhuman, or degrading treatment or cruel, inhuman, o degrading punishment may suffer from long-term, multiple psychological and physical problems (e.g., Carls Mortensen, & Kastrup, 2005; Gerrity, Keane, & Tuma, 2001; Hermansson, Timpka, & Thyber, 2003; Kannin Punamaki, & Qouta, 2003; Somnier, Vesti, Kastrup, & Genefke, 1992);

WHEREAS psychological knowledge and techniques (e.g., including but not limited to deprivation and disorientation techniques) may be used to design and carry out torture and other cruel, inhuman, or degrad treatment or cruel, inhuman, or degrading punishment (e.g., Conroy, 2000; Hovens & Drozdek, 2002; Mossallanejad, 2000);

WHEREAS the Ethical Principles of the APA *Ethical Principles of Psychologists and Code of Conduct* (200 call upon members of the APA to respect the inherent dignity and worth of the individual and strive for the preservation and protection of fundamental human rights recognizing the equal and inalienable rights of all members of the human family;

WHEREAS in 2000 APA received consultative status as a non-governmental organization (NGO) at the Ur Nations (UN) in recognition of evidence provided by APA of its efforts to promote human rights;

WHEREAS as an accredited NGO at the UN, the APA is committed to the spirit, purposes, and principles c Charter of the UN and other relevant international instruments;

WHEREAS APA's status as an accredited NGO at the UN carries the commitment to promote and protect human rights in accordance with the Charter of the UN and the Universal Declaration of Human Rights and contribute its expertise and resources to the implementation of the various human rights declarations, conventions and other standards of the UN;

WHEREAS, consistent with its history in supporting human rights, in its 1987 Human Rights Resolution, AF issued a strong statement that "the discipline of psychology, and the academic and professional activities o psychologists, are relevant for securing and maintaining human rights"; and undertook to promote knowled and compliance with UN instruments by resolving to commend the main UN human rights instruments and documents to the attention of its boards, committees and membership at large;

WHEREAS in its 1986 Resolution Against Torture, APA supported the United Nations Declaration and Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment[1];

WHEREAS the American Psychological Association 1986 Human Rights Resolution is specific in its suppo the United Nations Principles of Medical Ethics relevant to the Role of Health Personnel, particularly Physicians, in the Protection of Prisoners and Detainees against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment[2], which includes Principle 4a,

It is a contravention of medical ethics for health personnel . . . to apply their knowledge and skills in order to assist in the interrogation of prisoners and detainees in a manner that may adversely affec physical or mental health or condition of such prisoners or detainees and which is not in accordanc

with the relevant international instruments;

WHEREAS the American Psychological Association 1986 Human Rights Resolution is specific in its suppo
the joint congressional Resolution opposing torture that was signed into law by President Reagan on Octok
1984;

WHEREAS in August 2005 APA's Council of Representatives approved the motion to acknowledge Princip
2.2 of the United Nations Convention Against Torture and Other Cruel, Inhuman, and Degrading Treatment
Punishment, which states that

[T]here are no exceptional circumstances whatsoever, whether induced by a state of war or threat c
war, internal political instability or any other public emergency, that may be invoked as a justificatior
torture, including the invocation of laws, regulations, or orders;

BE IT RESOLVED that the APA reaffirms its 1986 condemnation of torture and other cruel, inhuman, or
degrading treatment or cruel, inhuman, or degrading punishment wherever it occurs;

BE IT RESOLVED that the APA reaffirms its support for the United Nations Declaration and Convention
Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment and its adoption of Artic
2.2, which states

[T]here are no exceptional circumstances whatsoever, whether induced by a state of war or a threa
war, internal political instability or any other public emergency, that may be invoked as a justificatior
torture;

BE IT RESOLVED that, in accordance with Article I of the United Nations Declaration and Convention Agai
Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment,

[T]he term "torture" means any act by which severe pain or suffering, whether physical or mental, is
intentionally inflicted upon a person for such purposes as obtaining from him or a third person
information or a confession, punishing him for an act he or a third person has committed or is suspe
of having committed, or intimidating or coercing him or a third person, or for any reason based on
discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with tl
consent or acquiescence of a public official or other person acting in an official [e.g., governmental,
religious, political, organizational] capacity. It does not include pain or suffering arising only from,
inherent in, or incidental to lawful sanctions [in accordance with both domestic and international law

BE IT RESOLVED, that the term "cruel, inhuman, or degrading treatment or punishment" means treatment
punishment by a psychologist that, in accordance with the McCain Amendment[3], is of a kind that would be
"prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States, as
defined in the United States Reservations[4], Declarations and Understandings to the United Nations Conver
Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment done at New Y
December 10, 1984."

BE IT RESOLVED that, based upon the American Psychological Association 1986 Human Rights Resolutic
the APA reaffirms its support for the United Nations Declaration and Convention Against Torture and Other
Cruel, Inhuman, or Degrading Treatment or Punishment, Principles of Medical Ethics relevant to the Role c
Health Personnel, particularly Physicians, in the Protection of Prisoners and Detainees against Torture and
Other Cruel, Inhuman, or Degrading Treatment or Punishment as well as the joint congressional Resolutior
opposing torture that was signed into law by President Reagan on October 4, 1984, and further supports th
McCain Amendment, the United Nations Basic Principles for the Treatment of Prisoners[5], and the United
Nations Principles on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman,
Degrading Treatment or Punishment[6];

BE IT RESOLVED that based upon the APA's long-standing commitment to basic human rights including it
position against torture, psychologists shall work in accordance with international human rights instruments
relevant to their roles;

BE IT RESOLVED that regardless of their roles, psychologists shall not knowingly engage in, tolerate, direc
support, advise, or offer training in torture or other cruel, inhuman, or degrading treatment or cruel, inhumai
degrading punishment;

BE IT RESOLVED that psychologists shall not provide knowingly any research, instruments, or knowledge
facilitates the practice of torture or other forms of cruel, inhuman, or degrading treatment or cruel, inhuman
degrading punishment;

BE IT RESOLVED that psychologists shall not knowingly participate in any procedure in which torture or ot forms of cruel, inhuman, or degrading treatment or cruel, inhuman, or degrading punishment is used or threatened7;

BE IT RESOLVED that should torture or other cruel, inhuman, or degrading treatment or cruel, inhuman, or degrading punishment evolve during a procedure where a psychologist is present, the psychologist shall attempt to intervene to stop such behavior, and failing that exit the procedure;

BE IT RESOLVED that psychologists shall be alert to acts of torture and other cruel, inhuman, or degrading treatment or cruel, inhuman, or degrading punishment and have an ethical responsibility to report these act the appropriate authorities;

BE IT FURTHER RESOLVED that, consistent with the August 2005 action of Council, the APA will continua disseminate and publicize this 2006 Resolution Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment, both within the Association (to boards, committees, and the membership at large and to the wider public.

**Expected Outcomes/Products:**

An updated Resolution on the use of Torture, and Other Cruel, Inhuman, and Degrading Treatment or Punishment

**co-sponsor(s):**

Divisions for Social Justice and members of COR: Neil Altman, Jean Lau Chin, Martha Banks, Rosie Bingh Laurie Wagner, Neil Massoth, Janet Swim, Bernice Lott, Jacqueline White, Division 19 (Society for Military Psychology), and approximately 50 other Council Representatives, see attached.

---

[1]The United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (http://www.unhchr.ch/html/menu3/b/h_cat39.htm) is an international human rights instrument intended to prevent torture and other similar activities. According to the Convention, torture is defined as, "a act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for si purposes as obtaining from him or a third person information or a confession, punishing him for an act he o third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.' The Convention also created the UN Committee Against Torture, which focuses on the duties of national leaders to serve in a preventive role concerning the use of torture and other cruel, inhuman, or degrading treatment or punishment.

[2]The Principles of Medical Ethics relevant to the Role of Health Personnel, particularly Physicians, in the Protection of Prisoners and Detainees against Torture and Other Cruel, Inhuman, or Degrading Treatment Punishment (http://www.unhchr.ch/html/menu3/b/h_comp40.htm) is a UN Human Rights Instrument adopte the General Assembly resolution 37/194of 18 December 1982. It contains a code of health personnel ethic: relevant to the protection of persons subjected to any form of detention or imprisonment against torture and other cruel, inhuman, or degrading treatment or punishment.

[3]McCain Amendment: Amendment No. 1977 HR 2863, the Defense Appropriations Bill of 2006 introduced Senator John McCain (http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=2005_record&docid=cr05oc05-19).

[4]Specifically, United States Reservation I.1 of the Reservations, Declarations and Understandings to the U Nations Convention Against Torture (http://www.unhchr.ch/html/menu2/6/cat/treaties/convention-reserv.htn stating, "the term 'cruel, inhuman or degrading treatment or punishment' means the cruel, unusual and inhumane treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."

[5]Basic Principles for the Treatment of Prisoners (http://www.ohchr.org/english/law/basicprinciples.htm) is a Human Rights Instrument adopted and proclaimed by General Assembly resolution 45/111 of 14 Decembe 1990. It contains the minimum standards for treatment of prisoners as human beings as set forth in the Universal Declaration of Human Rights, the International Covenant on Economic, Social and Cultural Right and the International Covenant on Civil and Political Rights and the Optional Protocol.

[6]The Principles on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (http://www.ohchr.org/english/law/investigation.htm) is a UN Human Rights Instrument recommended by General Assembly resolution 55/89 of 4 December 2000. The Principle outline recommended procedures related to the documentation of torture and other cruel, inhuman, or degrading treatment or punishment particularly by health care professionals.

[7]Declaration 4 of The World Medical Association Declaration of Tokyo. Guidelines for Physicians Concernii Torture and other Cruel, Inhuman or Degrading Treatment or Punishment in Relation to Detention and Imprisonment (http://www.wma.net/e/policy/c18.htm).

### References

Carlsson, J. M., Mortensen, E. L., & Kastrup, M. (2005). A follow-up study of mental health and health-relat quality of life in tortured refugees in multidisciplinary treatment. *Journal of Nervous and Mental Disease, 19* 651-657.

Conroy, J. (2000). *Unspeakable acts, ordinary people: The dynamics of torture.* Berkeley, CA: University of California Press.

Genefke, I. (2004). Torturers - Outlaws of modern civilization. Testimony before the Congressional Human Rights Caucus - Torture: A Global Update and the Need for Assistance for Victims of Torture. Retrieved Ma 17, 2006, from http://lantos.house.gov/HoR/CA12/Human+Rights+Caucus/ Briefing+Testimonies/092804+Testimony+of+Dr+Inge+Genefke.htm.

Gerrity, E., Keane, T. M., & Tuma, F. (Eds.). (2001). *The mental health consequences of torture.* Bethesda MD: National Institute of Mental Health.

Hermansson, A., Timpka, T., & Thyber, M. (2003). The long-term impact of torture on the mental health of wounded refugees: Findings and implications for nursing programmes. *Scandinavian Journal of Caring Sciences, 17,* 317-324.

Hovens, J. E., & Drozdek, B. (2002). The terror of torture: A continuum of evil. In C. E. Stout (Ed.), *The psychology of terrorism* (Vol. 2, pp. 75-104). Westport, CT: Praeger.

Human Rights Watch (2006). Torture worldwide. *Human Rights News.* Retrieved March 17, 2006, from http://hrw.org/english/docs/2005/ 04/27/china10549.htm.

Kanninen, K., Punamaki, R., & Qouta, S. (2003). Personality and trauma: Adult attachment and posttrauma distress among former political prisoners. *Peace and Conflict: Journal of Peace Psychology, 9,* 97-126.

Mossallanejad, E. (2000). Torture at the threshold of the new millennium. *Torture, 10,* 36-40.

Somnier. F., Vesti. P., Kastrup. M., & Genefke, I. K. (1992). Psycho-social consequences of torture: Curren knowledge and evidence. In M. Basoglu (Ed.), *Torture and its consequences: Current treatment approache* (pp. 56-71). New York: Cambridge University Press.

U.S. Department of State (2005). *2005 country reports on human rights practices.* Retrieved July 8, 2006, f http://www.state.gov/g/ drl/rls/hrrpt/2005/index.htm.

© 2007 American Psychological Association
750 First Street, NE • Washington, DC • 20002-4242
Telephone: 800-374-2721; 202-336-5500 • TDD/TTY: 202-336-6123
PsychNET® | Contact | Terms of Use | Privacy Policy | Security | Advertise with us



English | Español | Français |

**Field Activities    Issues    International Law    Human Rights Bodies    About OHCHR**

Home > International Law

**Related information:**

Human Rights Committee
(CCPR)

Status of ratification

Reservations and
declarations

**Quick navigation:**

Part I:

Article 1

Part II:

Article 2

Article 3

Article 4

Article 5

Part III:

Article 6

Article 7

Article 8

Article 9

Article 10

Article 11

Article 12

Article 13

Article 14

Article 15

Article 16

Article 17

Article 18

Article 19

## International Covenant on Civil and Political Rights

Text in PDF For

### Adopted and opened for signature, ratification and accession by Genera Assembly resolution 2200A (XXI) of 16 December 1966

### entry into force 23 March 1976, in accordance with Article 49

Preamble

The States Parties to the present Covenant,

Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all memb of the human family is the foundation of freedom, justice and peace in the world,

Recognizing that these rights derive from the inherent dignity of the human person,

Recognizing that, in accordance with the Universal Declaration of Human Rights, the ideal of f human beings enjoying civil and political freedom and freedom from fear and want can only be achieved if conditions are created whereby everyone may enjoy his civil and political rights, as well as his economic, social and cultural rights,

Considering the obligation of States under the Charter of the United Nations to promote unive respect for, and observance of, human rights and freedoms,

Realizing that the individual, having duties to other individuals and to the community to which belongs, is under a responsibility to strive for the promotion and observance of the rights recognized in the present Covenant,

Agree upon the following articles:

## PART I

### Article 1

1. All peoples have the right of self-determination. By virtue of that right they freely determin their political status and freely pursue their economic, social and cultural development.

2. All peoples may, for their own ends, freely dispose of their natural wealth and resources without prejudice to any obligations arising out of international economic co-operation, based upon the principle of mutual benefit, and international law. In no case may a people be depriv of its own means of subsistence.

3. The States Parties to the present Covenant, including those having responsibility for the administration of Non-Self-Governing and Trust Territories, shall promote the realization of th right of self-determination, and shall respect that right, in conformity with the provisions of th Charter of the United Nations.

Case 3:07-cv-05766-WHA   Document 11-2   Filed 04/04/2008   Page 10 of 40
International Covenant on Civil and Political Rights
Page 2 of 14

## PART II

Article 20

Article 21

Article 22

Article 23

Article 24

Article 25

Article 26

Article 27

Part IV

Article 28

Article 29

Article 30

Article 31

Article 32

Article 33

Article 34

Article 35

Article 36

Article 37

Article 38

Article 39

Article 40

Article 41

Article 42

Article 43

Article 44

Article 45

Part V

Article 46

Article 47

Part VI

Article 48

Article 49

Article 50

### Article 2

1. Each State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the presen Covenant, without distinction of any kind, such as race, colour, sex, language, religion, politic or other opinion, national or social origin, property, birth or other status.

2. Where not already provided for by existing legislative or other measures, each State Party the present Covenant undertakes to take the necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such laws other measures as may be necessary to give effect to the rights recognized in the present Covenant.

3. Each State Party to the present Covenant undertakes:

(a) To ensure that any person whose rights or freedoms as herein recognized are violated sha have an effective remedy, notwithstanding that the violation has been committed by persons acting in an official capacity;

(b) To ensure that any person claiming such a remedy shall have his right thereto determined competent judicial, administrative or legislative authorities, or by any other competent author provided for by the legal system of the State, and to develop the possibilities of judicial remed

(c) To ensure that the competent authorities shall enforce such remedies when granted.

### Article 3

The States Parties to the present Covenant undertake to ensure the equal right of men and women to the enjoyment of all civil and political rights set forth in the present Covenant.

### Article 4

1 . In time of public emergency which threatens the life of the nation and the existence of whi is officially proclaimed, the States Parties to the present Covenant may take measures derogating from their obligations under the present Covenant to the extent strictly required b the exigencies of the situation, provided that such measures are not inconsistent with their ot obligations under international law and do not involve discrimination solely on the ground of race, colour, sex, language, religion or social origin.

2. No derogation from articles 6, 7, 8 (paragraphs I and 2), 11, 15, 16 and 18 may be made under this provision.

3. Any State Party to the present Covenant availing itself of the right of derogation shall immediately inform the other States Parties to the present Covenant, through the intermediar of the Secretary-General of the United Nations, of the provisions from which it has derogated of the reasons by which it was actuated. A further communication shall be made, through the same intermediary, on the date on which it terminates such derogation.

### Article 5

1. Nothing in the present Covenant may be interpreted as implying for any State, group or person any right to engage in any activity or perform any act aimed at the destruction of any the rights and freedoms recognized herein or at their limitation to a greater extent than is provided for in the present Covenant.

2. There shall be no restriction upon or derogation from any of the fundamental human rights recognized or existing in any State Party to the present Covenant pursuant to law, convention regulations or custom on the pretext that the present Covenant does not recognize such right that it recognizes them to a lesser extent.

## PART III

## Article 6

Article 51

Article 52

Article 53

1. Every human being has the inherent right to life. This right shall be protected by law. No or shall be arbitrarily deprived of his life.

2. In countries which have not abolished the death penalty, sentence of death may be impose only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to th Convention on the Prevention and Punishment of the Crime of Genocide. This penalty can only carried out pursuant to a final judgement rendered by a competent court.

3. When deprivation of life constitutes the crime of genocide, it is understood that nothing in t article shall authorize any State Party to the present Covenant to derogate in any way from ar obligation assumed under the provisions of the Convention on the Prevention and Punishment the Crime of Genocide.

4. Anyone sentenced to death shall have the right to seek pardon or commutation of the sentence. Amnesty, pardon or commutation of the sentence of death may be granted in all cases.

5. Sentence of death shall not be imposed for crimes committed by persons below eighteen ye of age and shall not be carried out on pregnant women.

6. Nothing in this article shall be invoked to delay or to prevent the abolition of capital punishment by any State Party to the present Covenant.

## Article 7

No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishme In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

## Article 8

1. No one shall be held in slavery; slavery and the slave-trade in all their forms shall be prohibited.

2. No one shall be held in servitude.

3.

(a) No one shall be required to perform forced or compulsory labour;

(b) Paragraph 3 (a) shall not be held to preclude, in countries where imprisonment with hard labour may be imposed as a punishment for a crime, the performance of hard labour in pursuance of a sentence to such punishment by a competent court;

(c) For the purpose of this paragraph the term "forced or compulsory labour" shall not include

(i) Any work or service, not referred to in subparagraph (b), normally required of a person wh under detention in consequence of a lawful order of a court, or of a person during conditional release from such detention;

(ii) Any service of a military character and, in countries where conscientious objection is recognized, any national service required by law of conscientious objectors;

(iii) Any service exacted in cases of emergency or calamity threatening the life or well-being c the community;

(iv) Any work or service which forms part of normal civil obligations.

### Article 9

1. Everyone has the right to liberty and security of person. No one shall be subjected to arbitr
arrest or detention. No one shall be deprived of his liberty except on such grounds and in
accordance with such procedure as are established by law.

2. Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arres
and shall be promptly informed of any charges against him.

3. Anyone arrested or detained on a criminal charge shall be brought promptly before a judge
other officer authorized by law to exercise judicial power and shall be entitled to trial within a
reasonable time or to release. It shall not be the general rule that persons awaiting trial shall
detained in custody, but release may be subject to guarantees to appear for trial, at any othe
stage of the judicial proceedings, and, should occasion arise, for execution of the judgement.

4. Anyone who is deprived of his liberty by arrest or detention shall be entitled to take
proceedings before a court, in order that that court may decide without delay on the lawfulnes
of his detention and order his release if the detention is not lawful.

5. Anyone who has been the victim of unlawful arrest or detention shall have an enforceable
right to compensation.

### Article 10

1. All persons deprived of their liberty shall be treated with humanity and with respect for the
inherent dignity of the human person.

2.

(a) Accused persons shall, save in exceptional circumstances, be segregated from convicted
persons and shall be subject to separate treatment appropriate to their status as unconvicted
persons;

(b) Accused juvenile persons shall be separated from adults and brought as speedily as possit
for adjudication.

3. The penitentiary system shall comprise treatment of prisoners the essential aim of which sł
be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adu
and be accorded treatment appropriate to their age and legal status.

### Article 11

No one shall be imprisoned merely on the ground of inability to fulfil a contractual obligation.

### Article 12

1. Everyone lawfully within the territory of a State shall, within that territory, have the right to
liberty of movement and freedom to choose his residence.

2. Everyone shall be free to leave any country, including his own.

3. The above-mentioned rights shall not be subject to any restrictions except those which are
provided by law, are necessary to protect national security, public order (ordre public), public
health or morals or the rights and freedoms of others, and are consistent with the other rights
recognized in the present Covenant.

4. No one shall be arbitrarily deprived of the right to enter his own country.

### Article 13

An alien lawfully in the territory of a State Party to the present Covenant may be expelled
therefrom only in pursuance of a decision reached in accordance with law and shall, except

where compelling reasons of national security otherwise require, be allowed to submit the reasons against his expulsion and to have his case reviewed by, and be represented for the purpose before, the competent authority or a person or persons especially designated by the competent authority.

## Article 14

1. All persons shall be equal before the courts and tribunals. In the determination of any crimi charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled a fair and public hearing by a competent, independent and impartial tribunal established by la The press and the public may be excluded from all or part of a trial for reasons of morals, pub order (ordre public) or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgement rendered in a criminal case or in a suit at law shall be made public except where tl interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputo or the guardianship of children.

2. Everyone charged with a criminal offence shall have the right to be presumed innocent unti proved guilty according to law.

3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality: (a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b) To have adequate time and facilities for the preparation of his defence and to communicat with counsel of his own choosing;

(c) To be tried without undue delay;

(d) To be tried in his presence, and to defend himself in person or through legal assistance of own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e) To examine, or have examined, the witnesses against him and to obtain the attendance ai examination of witnesses on his behalf under the same conditions as witnesses against him;

(f) To have the free assistance of an interpreter if he cannot understand or speak the languag used in court;

(g) Not to be compelled to testify against himself or to confess guilt.

4. In the case of juvenile persons, the procedure shall be such as will take account of their ag and the desirability of promoting their rehabilitation.

5. Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6. When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wh or partly attributable to him.

7. No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

## Article 15

1 . No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it v

committed. Nor shall a heavier penalty be imposed than the one that was applicable at the tim
when the criminal offence was committed. If, subsequent to the commission of the offence,
provision is made by law for the imposition of the lighter penalty, the offender shall benefit
thereby.

2. Nothing in this article shall prejudice the trial and punishment of any person for any act or
omission which, at the time when it was committed, was criminal according to the general
principles of law recognized by the community of nations.

## Article 16

Everyone shall have the right to recognition everywhere as a person before the law.

## Article 17

1. No one shall be subjected to arbitrary or unlawful interference with his privacy, family, hom
or correspondence, nor to unlawful attacks on his honour and reputation.

2. Everyone has the right to the protection of the law against such interference or attacks.

## Article 18

1. Everyone shall have the right to freedom of thought, conscience and religion. This right sha
include freedom to have or to adopt a religion or belief of his choice, and freedom, either
individually or in community with others and in public or private, to manifest his religion or be
in worship, observance, practice and teaching.

2. No one shall be subject to coercion which would impair his freedom to have or to adopt a
religion or belief of his choice.

3. Freedom to manifest one's religion or beliefs may be subject only to such limitations as are
prescribed by law and are necessary to protect public safety, order, health, or morals or the
fundamental rights and freedoms of others.

4. The States Parties to the present Covenant undertake to have respect for the liberty of
parents and, when applicable, legal guardians to ensure the religious and moral education of
their children in conformity with their own convictions.

## Article 19

1. Everyone shall have the right to hold opinions without interference.

2. Everyone shall have the right to freedom of expression; this right shall include freedom to
seek, receive and impart information and ideas of all kinds, regardless of frontiers, either oral
in writing or in print, in the form of art, or through any other media of his choice.

3. The exercise of the rights provided for in paragraph 2 of this article carries with it special
duties and responsibilities. It may therefore be subject to certain restrictions, but these shall
be such as are provided by law and are necessary:

(a) For respect of the rights or reputations of others;

(b) For the protection of national security or of public order (ordre public), or of public health
morals.

## Article 20

1. Any propaganda for war shall be prohibited by law.

2. Any advocacy of national, racial or religious hatred that constitutes incitement to
discrimination, hostility or violence shall be prohibited by law.

### Article 21

The right of peaceful assembly shall be recognized. No restrictions may be placed on the exer of this right other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms others.

### Article 22

1. Everyone shall have the right to freedom of association with others, including the right to fo and join trade unions for the protection of his interests.

2. No restrictions may be placed on the exercise of this right other than those which are prescribed by law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals the protection of the rights and freedoms of others. This article shall not prevent the impositic of lawful restrictions on members of the armed forces and of the police in their exercise of thi right.

3. Nothing in this article shall authorize States Parties to the International Labour Organisatioi Convention of 1948 concerning Freedom of Association and Protection of the Right to Organize take legislative measures which would prejudice, or to apply the law in such a manner as to prejudice, the guarantees provided for in that Convention.

### Article 23

1. The family is the natural and fundamental group unit of society and is entitled to protection society and the State.

2. The right of men and women of marriageable age to marry and to found a family shall be recognized.

3. No marriage shall be entered into without the free and full consent of the intending spouse:

4. States Parties to the present Covenant shall take appropriate steps to ensure equality of rig and responsibilities of spouses as to marriage, during marriage and at its dissolution. In the ca of dissolution, provision shall be made for the necessary protection of any children.

### Article 24

1. Every child shall have, without any discrimination as to race, colour, sex, language, religior national or social origin, property or birth, the right to such measures of protection as are required by his status as a minor, on the part of his family, society and the State.

2. Every child shall be registered immediately after birth and shall have a name.

3. Every child has the right to acquire a nationality.

### Article 25

Every citizen shall have the right and the opportunity, without any of the distinctions mention in article 2 and without unreasonable restrictions:

(a) To take part in the conduct of public affairs, directly or through freely chosen representatives;

(b) To vote and to be elected at genuine periodic elections which shall be by universal and eqι suffrage and shall be held by secret ballot, guaranteeing the free expression of the will of the electors;

(c) To have access, on general terms of equality, to public service in his country.

## Article 26

All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee t all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, bi or other status.

## Article 27

In those States in which ethnic, religious or linguistic minorities exist, persons belonging to such minorities shall not be denied the right, in community with the other members of their group, to enjoy their own culture, to profess and practise their own religion, or to use their ov language.

### PART IV

## Article 28

1. There shall be established a Human Rights Committee (hereafter referred to in the present Covenant as the Committee). It shall consist of eighteen members and shall carry out the functions hereinafter provided.

2. The Committee shall be composed of nationals of the States Parties to the present Covenar who shall be persons of high moral character and recognized competence in the field of huma rights, consideration being given to the usefulness of the participation of some persons havinç legal experience.

3. The members of the Committee shall be elected and shall serve in their personal capacity.

## Article 29

1. The members of the Committee shall be elected by secret ballot from a list of persons possessing the qualifications prescribed in article 28 and nominated for the purpose by the Sta Parties to the present Covenant.

2. Each State Party to the present Covenant may nominate not more than two persons. These persons shall be nationals of the nominating State.

3. A person shall be eligible for renomination.

## Article 30

1. The initial election shall be held no later than six months after the date of the entry into for of the present Covenant.

2. At least four months before the date of each election to the Committee, other than an elect to fill a vacancy declared in accordance with article 34, the Secretary-General of the United Nations shall address a written invitation to the States Parties to the present Covenant to subi their nominations for membership of the Committee within three months.

3. The Secretary-General of the United Nations shall prepare a list in alphabetical order of all t persons thus nominated, with an indication of the States Parties which have nominated them, and shall submit it to the States Parties to the present Covenant no later than one month befc the date of each election.

4. Elections of the members of the Committee shall be held at a meeting of the States Parties. the present Covenant convened by the Secretary General of the United Nations at the Headquarters of the United Nations. At that meeting, for which two thirds of the States Partie: the present Covenant shall constitute a quorum, the persons elected to the Committee shall b those nominees who obtain the largest number of votes and an absolute majority of the votes the representatives of States Parties present and voting.

## Article 31

1. The Committee may not include more than one national of the same State.

2. In the election of the Committee, consideration shall be given to equitable geographical distribution of membership and to the representation of the different forms of civilization and the principal legal systems.

## Article 32

1. The members of the Committee shall be elected for a term of four years. They shall be eligi for re-election if renominated. However, the terms of nine of the members elected at the first election shall expire at the end of two years; immediately after the first election, the names o these nine members shall be chosen by lot by the Chairman of the meeting referred to in artic 30, paragraph 4.

2. Elections at the expiry of office shall be held in accordance with the preceding articles of thi part of the present Covenant.

## Article 33

1. If, in the unanimous opinion of the other members, a member of the Committee has ceasei carry out his functions for any cause other than absence of a temporary character, the Chairn of the Committee shall notify the Secretary-General of the United Nations, who shall then dec the seat of that member to be vacant.

2. In the event of the death or the resignation of a member of the Committee, the Chairman shall immediately notify the Secretary-General of the United Nations, who shall declare the se vacant from the date of death or the date on which the resignation takes effect.

## Article 34

1. When a vacancy is declared in accordance with article 33 and if the term of office of the member to be replaced does not expire within six months of the declaration of the vacancy, th Secretary-General of the United Nations shall notify each of the States Parties to the present Covenant, which may within two months submit nominations in accordance with article 29 for purpose of filling the vacancy.

2. The Secretary-General of the United Nations shall prepare a list in alphabetical order of the persons thus nominated and shall submit it to the States Parties to the present Covenant. The election to fill the vacancy shall then take place in accordance with the relevant provisions of t part of the present Covenant.

3. A member of the Committee elected to fill a vacancy declared in accordance with article 33 shall hold office for the remainder of the term of the member who vacated the seat on the Committee under the provisions of that article.

## Article 35

The members of the Committee shall, with the approval of the General Assembly of the Unitei Nations, receive emoluments from United Nations resources on such terms and conditions as General Assembly may decide, having regard to the importance of the Committee's responsibilities.

## Article 36

The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under the present Covenant.

## Article 37

1. The Secretary-General of the United Nations shall convene the initial meeting of the

Case 3:07-cv-05766-WHA    Document 11-2    Filed 04/04/2008    Page 18 of 40

Committee at the Headquarters of the United Nations.

2. After its initial meeting, the Committee shall meet at such times as shall be provided in its rules of procedure.

3. The Committee shall normally meet at the Headquarters of the United Nations or at the Uni Nations Office at Geneva.

### Article 38

Every member of the Committee shall, before taking up his duties, make a solemn declaratior open committee that he will perform his functions impartially and conscientiously.

### Article 39

1. The Committee shall elect its officers for a term of two years. They may be re-elected.

2. The Committee shall establish its own rules of procedure, but these rules shall provide, inte alia, that:

(a) Twelve members shall constitute a quorum;

(b) Decisions of the Committee shall be made by a majority vote of the members present.

### Article 40

1. The States Parties to the present Covenant undertake to submit reports on the measures th have adopted which give effect to the rights recognized herein and on the progress made in th enjoyment of those rights: (a) Within one year of the entry into force of the present Covenant the States Parties concerned;

(b) Thereafter whenever the Committee so requests.

2. All reports shall be submitted to the Secretary-General of the United Nations, who shall transmit them to the Committee for consideration. Reports shall indicate the factors and difficulties, if any, affecting the implementation of the present Covenant.

3. The Secretary-General of the United Nations may, after consultation with the Committee, transmit to the specialized agencies concerned copies of such parts of the reports as may fall within their field of competence.

4. The Committee shall study the reports submitted by the States Parties to the present Covenant. It shall transmit its reports, and such general comments as it may consider appropriate, to the States Parties. The Committee may also transmit to the Economic and Soc Council these comments along with the copies of the reports it has received from States Parti to the present Covenant.

5. The States Parties to the present Covenant may submit to the Committee observations on comments that may be made in accordance with paragraph 4 of this article.

### Article 41

1. A State Party to the present Covenant may at any time declare under this article that it recognizes the competence of the Committee to receive and consider communications to the effect that a State Party claims that another State Party is not fulfilling its obligations under th present Covenant. Communications under this article may be received and considered only if submitted by a State Party which has made a declaration recognizing in regard to itself the competence of the Committee. No communication shall be received by the Committee if it concerns a State Party which has not made such a declaration. Communications received und this article shall be dealt with in accordance with the following procedure:

(a) If a State Party to the present Covenant considers that another State Party is not giving

effect to the provisions of the present Covenant, it may, by written communication, bring the matter to the attention of that State Party. Within three months after the receipt of the communication the receiving State shall afford the State which sent the communication an explanation, or any other statement in writing clarifying the matter which should include, to tl extent possible and pertinent, reference to domestic procedures and remedies taken, pending available in the matter;

(b) If the matter is not adjusted to the satisfaction of both States Parties concerned within six months after the receipt by the receiving State of the initial communication, either State shall have the right to refer the matter to the Committee, by notice given to the Committee and to other State;

(c) The Committee shall deal with a matter referred to it only after it has ascertained that all available domestic remedies have been invoked and exhausted in the matter, in conformity w the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged;

(d) The Committee shall hold closed meetings when examining communications under this article;

(e) Subject to the provisions of subparagraph (c), the Committee shall make available its goo offices to the States Parties concerned with a view to a friendly solution of the matter on the basis of respect for human rights and fundamental freedoms as recognized in the present Covenant;

(f) In any matter referred to it, the Committee may call upon the States Parties concerned, referred to in subparagraph (b), to supply any relevant information;

(g) The States Parties concerned, referred to in subparagraph (b), shall have the right to be represented when the matter is being considered in the Committee and to make submissions orally and/or in writing;

(h) The Committee shall, within twelve months after the date of receipt of notice under subparagraph (b), submit a report:

(i) If a solution within the terms of subparagraph (e) is reached, the Committee shall confine report to a brief statement of the facts and of the solution reached;

(ii) If a solution within the terms of subparagraph (e) is not reached, the Committee shall con its report to a brief statement of the facts; the written submissions and record of the oral submissions made by the States Parties concerned shall be attached to the report. In every matter, the report shall be communicated to the States Parties concerned.

2. The provisions of this article shall come into force when ten States Parties to the present Covenant have made declarations under paragraph I of this article. Such declarations shall be deposited by the States Parties with the Secretary-General of the United Nations, who shall transmit copies thereof to the other States Parties. A declaration may be withdrawn at any tin by notification to the Secretary-General. Such a withdrawal shall not prejudice the considerati of any matter which is the subject of a communication already transmitted under this article; further communication by any State Party shall be received after the notification of withdrawa the declaration has been received by the Secretary-General, unless the State Party concerned has made a new declaration.

## Article 42

1.

(a) If a matter referred to the Committee in accordance with article 41 is not resolved to the satisfaction of the States Parties concerned, the Committee may, with the prior consent of the States Parties concerned, appoint an ad hoc Conciliation Commission (hereinafter referred to ; the Commission). The good offices of the Commission shall be made available to the States Parties concerned with a view to an amicable solution of the matter on the basis of respect for the present Covenant;

(b) The Commission shall consist of five persons acceptable to the States Parties concerned. I

International Covenant on Civil and Political Rights
Case 3:07-cv-05766-WHA    Document 11-2    Filed 04/04/2008    Page 20 of 40
Page 12 of 14

the States Parties concerned fail to reach agreement within three months on all or part of the composition of the Commission, the members of the Commission concerning whom no agreement has been reached shall be elected by secret ballot by a two-thirds majority vote of the Committee from among its members.

2. The members of the Commission shall serve in their personal capacity. They shall not be nationals of the States Parties concerned, or of a State not Party to the present Covenant, or State Party which has not made a declaration under article 41.

3. The Commission shall elect its own Chairman and adopt its own rules of procedure.

4. The meetings of the Commission shall normally be held at the Headquarters of the United Nations or at the United Nations Office at Geneva. However, they may be held at such other convenient places as the Commission may determine in consultation with the Secretary-General of the United Nations and the States Parties concerned.

5. The secretariat provided in accordance with article 36 shall also service the commissions appointed under this article.

6. The information received and collated by the Committee shall be made available to the Commission and the Commission may call upon the States Parties concerned to supply any other relevant information.

7. When the Commission has fully considered the matter, but in any event not later than twelve months after having been seized of the matter, it shall submit to the Chairman of the Committee a report for communication to the States Parties concerned:

(a) If the Commission is unable to complete its consideration of the matter within twelve months, it shall confine its report to a brief statement of the status of its consideration of the matter;

(b) If an amicable solution to the matter on tie basis of respect for human rights as recognized in the present Covenant is reached, the Commission shall confine its report to a brief statement of the facts and of the solution reached;

(c) If a solution within the terms of subparagraph (b) is not reached, the Commission's report shall embody its findings on all questions of fact relevant to the issues between the States Parties concerned, and its views on the possibilities of an amicable solution of the matter. This report shall also contain the written submissions and a record of the oral submissions made by the States Parties concerned;

(d) If the Commission's report is submitted under subparagraph (c), the States Parties concerned shall, within three months of the receipt of the report, notify the Chairman of the Committee whether or not they accept the contents of the report of the Commission.

8. The provisions of this article are without prejudice to the responsibilities of the Committee under article 41.

9. The States Parties concerned shall share equally all the expenses of the members of the Commission in accordance with estimates to be provided by the Secretary-General of the United Nations.

10. The Secretary-General of the United Nations shall be empowered to pay the expenses of the members of the Commission, if necessary, before reimbursement by the States Parties concerned, in accordance with paragraph 9 of this article.

### Article 43

The members of the Committee, and of the ad hoc conciliation commissions which may be appointed under article 42, shall be entitled to the facilities, privileges and immunities of experts on mission for the United Nations as laid down in the relevant sections of the Convention on the Privileges and Immunities of the United Nations.

### Article 44

The provisions for the implementation of the present Covenant shall apply without prejudice t
the procedures prescribed in the field of human rights by or under the constituent instruments
and the conventions of the United Nations and of the specialized agencies and shall not prevel
the States Parties to the present Covenant from having recourse to other procedures for settli
a dispute in accordance with general or special international agreements in force between the

### Article 45

The Committee shall submit to the General Assembly of the United Nations, through the
Economic and Social Council, an annual report on its activities.

## PART V

### Article 46

Nothing in the present Covenant shall be interpreted as impairing the provisions of the Charte
the United Nations and of the constitutions of the specialized agencies which define the
respective responsibilities of the various organs of the United Nations and of the specialized
agencies in regard to the matters dealt with in the present Covenant.

### Article 47

Nothing in the present Covenant shall be interpreted as impairing the inherent right of all peo
to enjoy and utilize fully and freely their natural wealth and resources.

## PART VI

### Article 48

1. The present Covenant is open for signature by any State Member of the United Nations or
member of any of its specialized agencies, by any State Party to the Statute of the Internatior
Court of Justice, and by any other State which has been invited by the General Assembly of tr
United Nations to become a Party to the present Covenant.

2. The present Covenant is subject to ratification. Instruments of ratification shall be deposite
with the Secretary-General of the United Nations.

3. The present Covenant shall be open to accession by any State referred to in paragraph 1 ol
this article.

4. Accession shall be effected by the deposit of an instrument of accession with the Secretary·
General of the United Nations.

5. The Secretary-General of the United Nations shall inform all States which have signed this
Covenant or acceded to it of the deposit of each instrument of ratification or accession.

### Article 49

1. The present Covenant shall enter into force three months after the date of the deposit with
Secretary-General of the United Nations of the thirty-fifth instrument of ratification or instrum
of accession.

2. For each State ratifying the present Covenant or acceding to it after the deposit of the thirt
fifth instrument of ratification or instrument of accession, the present Covenant shall enter int
force three months after the date of the deposit of its own instrument of ratification or
instrument of accession.

### Article 50

The provisions of the present Covenant shall extend to all parts of federal States without any
limitations or exceptions.

## Article 51

1. Any State Party to the present Covenant may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General of the United Nations shall thereupon communicate any proposed amendments to the States Parties to the present Covenant with a request that they notify him whether they favour a conference of States Part for the purpose of considering and voting upon the proposals. In the event that at least one th of the States Parties favours such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority the States Parties present and voting at the conference shall be submitted to the General Assembly of the United Nations for approval.

2. Amendments shall come into force when they have been approved by the General Assembl the United Nations and accepted by a two-thirds majority of the States Parties to the present Covenant in accordance with their respective constitutional processes. 3. When amendments come into force, they shall be binding on those States Parties which have accepted them, othe States Parties still being bound by the provisions of the present Covenant and any earlier amendment which they have accepted.

## Article 52

1. Irrespective of the notifications made under article 48, paragraph 5, the Secretary-General the United Nations shall inform all States referred to in paragraph I of the same article of the following particulars:

(a) Signatures, ratifications and accessions under article 48;

(b) The date of the entry into force of the present Covenant under article 49 and the date of t entry into force of any amendments under article 51.

## Article 53

1. The present Covenant, of which the Chinese, English, French, Russian and Spanish texts ar equally authentic, shall be deposited in the archives of the United Nations.

2. The Secretary-General of the United Nations shall transmit certified copies of the present Covenant to all States referred to in article 48.

© OHCHR 1996-2006                                        Site map      ✉ Contact

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)    **Page 1**

**\*746**  223 Cal.Rptr. 746

178 Cal.App.3d 526

Court of Appeal, First District, Division 5, California.

**Canal KEYHEA et al., Plaintiffs and Respondents,**
**v.**
**Ruth RUSHEN et al., Defendants and Appellants.**

**A028586.**
March 6, 1986.

As Modified on Denial of Rehearing March 25, 1986.

Review Denied July 10, 1986.

Taxpayers brought action challenging involuntary psychiatric medication of prisoners. The Superior Court, Solano County, William E. Jensen, J., issued injunction against long-term medication without adherence to certain procedural requisites, and State appealed. The Court of Appeal, King, J., held that prisoners were entitled to judicial determination of their competency to refuse treatment before they could be subjected to long-term involuntary psychotropic medication.

Affirmed.

West Headnotes

[1]    Prisons ☜4(1)

    310 ----
        310k4 Regulation and Supervision
           310k4(1) In General.

Statute providing that prisoner may be deprived only of such rights as are necessary to provide for reasonable security of institution and reasonable protection of public applies to statutory, as well as constitutional, rights. West's Ann.Cal.Penal Code § 2600.

[2]    Mental Health ☜51.15

    257A ----
        257AII Care and Support of Mentally Disordered Persons
           257AII(A) Custody and Cure
               257Ak51 Restraint or Treatment
                   257Ak51.15 Involuntary Treatment or Medication.

        (Formerly 257Ak51)

Involuntarily detained mentally disordered persons subject to conservatorship have right to refuse involuntary long-term psychotropic medication, absent judicial determination of their incompetency to do so. West's Ann.Cal.Welf. & Inst.Code §§ 5357, 5358, 5358.2.

[3]    Mental Health ☜51.15

    257A ----
        257AII Care and Support of Mentally Disordered Persons

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)          **Page 2**

      257AII(A) Custody and Cure
       257Ak51 Restraint or Treatment
        257Ak51.15 Involuntary Treatment or Medication.

      (Formerly 257Ak51)

  Nonprisoners have statutory right to refuse long-term treatment with psychotropic drugs absent judicial determination that they are incompetent to do so.  West's Ann.Cal.Welf. & Inst.Code §§ 5357, 5358, 5358.2; West's Ann.Cal.Prob.Code § 3201.

[4]    Prisons ☞17(2)

    310 ----
      310k17 Maintenance and Care of Prisoners
       310k17(2) Medical and Mental Care.

  Prisoners are entitled to judicial determination of their competency to refuse treatment before they can be subjected to long-term involuntary psychotropic medication;  by statute, prisoners could be deprived only of those rights whose deprivation was required to maintain reasonable security of institution, and attendance of prisoners at judicial hearings on competency to refuse treatment did not threaten prison security.  West's Ann.Cal.Welf. & Inst.Code §§ 5357, 5358, 5358.2;  West's Ann.Cal.Penal Code § 2600.

  [178 Cal.App.3d 530]  **\*747**  Peter E. Sheehan, Clifford C. Sweet, Legal Aid Society of Alameda County, Oakland, Steven Zieff, Legal Aid Society of San Mateo County, Redwood City, for plaintiffs and respondents.

  John K. Van de Kamp, Atty. Gen., Gloria F. De Hart, Ralph M. Johnson, Kenneth C. Young, Bruce M. Slavin, Deputy Attys. Gen., San Francisco, for defendants and appellants.

  KING, Associate Justice.

  In this case we hold that state prisoners presently have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so.

    [178 Cal.App.3d 531]

I. Introduction

  Psychotropic (or antipsychotic) drugs (FN1) have become a primary tool of public mental health professionals for treating serious mental disorders, replacing such earlier measures as lobotomy, insulin shock, and electroshock. In many patients they minimize or eliminate psychotic symptoms. (Kemna, *Current Status of Institutionalized Mental Health Patients' Right to Refuse Psychotropic Drugs* (1985) 6 Journal of Legal Medicine 107, 109-110 (hereafter cited as *Right to Refuse* );  Gelman, *Mental \*748 Hospital Drugs, Professionalism, and the Constitution* (1984) 72 Georgetown L.J. 1725, 1726, 1741 (hereafter cited as *Mental Health Drugs* ).)  They "also possess a remarkable potential for undermining individual will and self-direction, thereby producing a psychological state of unusual receptiveness to the directions of custodians." (*Mental Health Drugs, supra,* at p. 1751.)

  The drugs also, however, have many serious side effects.  Reversible side effects include akathesia (a distressing urge to move), akinesia (a reduced capacity for spontaneity), pseudo-Parkinsonism (causing retarded muscle movements, masked facial expression, body rigidity, tremor, and a shuffling gait), and various other complications such as muscle spasms, blurred vision, dry mouth, sexual disfunction, drug-induced mental disorders, and on rare occasions sudden death.  A potentially permanent side effect of long-term exposure, for which there is no cure, is tardive diskenesia, a neurological disorder manifested by involuntary, rhythmic, and grotesque movements of the face, mouth, tongue, jaw, and extremities. (*Right to Refuse, supra,* at pp. 111-114;  *Mental Health Drugs, supra,* at pp. 1742-1746.)  (FN2)

  At the California Medical Facility at Vacaville (CMF) the decision to administer psychotropic drugs

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)    **Page 3**

involuntarily on a long-term (FN3) basis is made by the chairman of an institutional review board upon referral by a prison psychiatrist. After an oral presentation by the referring psychiatrist, and view and discussion of the patient's file by the board members, and an interview of the prisoner, the board chairman--a psychiatrist--makes the decision whether to medicate. CMF's internal procedures state that a decision to medicate is reviewed by the board every 90 days. Prisoners are afforded no right to counsel at board hearings and no right to judicial review.

[178 Cal.App.3d 532]

## II. Procedural History

The present case originated in 1977 as a combination individual action by two taxpayers and class action by prisoner Canal Keyhea, arising from CMF's practice of forced psychiatric drugging and Keyhea's transfer from CMF to a state mental health facility. The transfer issue was not asserted by the taxpayers and was eliminated by Keyhea's subsequent dismissal from the action. (FN4)

The action proceeded as a taxpayers' suit against various state officials (hereafter the State) on involuntary psychiatric medication of prisoners. The pleadings alleged that forced drugging without judicial sanction violates the federal and state Constitutions as well as Penal Code section 2600. Under section 2600 a prisoner may be deprived only of such rights "as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (See generally *De Lancie v. Superior Court* (1982) 31 Cal.3d 865, 870-871, 183 Cal.Rptr. 866, 647 P.2d 142 [describing legislative transformation of Penal Code section 2600 from civil death statute to prison bill of rights].) In 1982 the trial court bifurcated the statutory and constitutional issues, deferring trial of the latter.

At the trial of the statutory issue the taxpayers presented evidence tending to show that attendance of prisoners at judicial hearings on their competency to refuse treatment would not threaten prison security or public safety within the meaning of Penal Code section 2600.

**\*749** On July 9, 1984, the court rendered judgment declaring that the State had violated Penal Code section 2600 by subjecting prisoners to long-term involuntary medication without a judicial determination of competency, the assistance of counsel, and a right to personal appearance. The court enjoined the State from subjecting prisoners to long-term involuntary medication without adhering to certain of the procedural requirements contained in specified provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, §§ 5000 et seq.) (hereafter LPS) and the Probate Code. (FN5) In a statement of [178 Cal.App.3d 533] decision the court reasoned that nonprisoners have a statutory right to a judicial determination of competency, and deprivation of this right to prisoners was not necessary to protect prison security.

## III. Discussion

A. *Effect of Penal Code section 2600.*

The State contends preliminarily that the trial court erred by pursuing a prison security analysis under Penal Code section 2600, and that the court's focus should instead have been on the adequacy of existing protections for mentally disordered prisoners. Specifically, the State argues that (1) Penal Code section 2600 protects only constitutional rights and does not encompass any statutory right of nonprisoners to a court determination of competency, and (2) the applicable rule here--affording a fundamental right to give or withhold consent to a proposed psychiatric treatment--requires consideration of the adequacy of existing protection.

[1] The State's proposed adequacy of protection analysis cannot apply, however, because Penal Code section 2600 does indeed protect statutory rights. Section 2600 appears in a statutory scheme entitled "Civil Rights." (Pen.Code, part 3, tit. 1, ch. 3, art. 1.) Section 2600 states the general rule that prisoners retain civil rights other than those rights that would jeopardize prison security or public safety. The other statute in the scheme, Penal Code section 2601, lists specific civil rights that are retained notwithstanding other laws. (In effect the Legislature has predetermined that there is no overriding security interest in infringing the rights listed in section 2601.) Among these enumerated "civil rights" is the *statutory* right to receive workers compensation benefits under Labor Code sections 3370 and 3371 and Penal Code section 5069. (Pen.Code, § 2601, subd. (i).) (FN6) This leaves no

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)      **Page 4**

doubt that the civil rights protected by Penal Code sections 2600 and 2601 include statutory rights. (Cf. Black's Law Dict. (5th ed. 1979) p. 1189, col. 2 [describing "right" as "A power, privilege, or immunity guaranteed under a constitution, statutes or decisional laws ..."]; see generally *De Lancie v. Superior Court, supra,* 31 Cal.3d at p. 874, fn. 8, 183 Cal.Rptr. 866, 647 P.2d 142 [Penal Code sections 2600 and 2601 "guarantee that prisoners shall retain *all* rights [178 Cal.App.3d 534] except to the extent that restrictions are necessary for public safety or institutional security."], emphasis in original.)

**\*750**   The State argues that section 2600 cannot encompass statutory rights because this would require application of innumerable statutory rights (none of which the State specifically identifies) such as those afforded by the Labor and Education Codes, without any tempering "cost/benefit" analysis.  But section 2600, as a prison "bill of rights" (see *In re Harrell* (1970) 2 Cal.3d 675, 698, 87 Cal.Rptr. 504, 470 P.2d 640, cert. den. (1971) 401 U.S. 914, 91 S.Ct. 890, 27 L.Ed.2d 814), affords civil rights to prisoners absolutely (except where deprivation is necessary to prison security or public safety), without cost/benefit considerations, presumably because of the importance of civil rights in a free society.  In any event, the State's nonspecific threat of workers' and students' rights flooding the prison system is meritless;  few if any of these rights will have any logical application in a prison setting.

Because Penal Code section 2600 does encompass statutory rights, the "adequate protection" analysis proposed by the State is irrelevant here.  The question is indeed whether nonprisoners have a right to a judicial determination of competency before they are administered involuntary long-term psychotropic medication, and, if so, whether denial of this right to prisoners is necessary to prison security or public safety.

B. *Rights of Nonprisoners to Judicial Determination of Competency.*

1. Rights of LPS Conservatees.

The foundation of the trial court's conclusion that nonprisoners have a right to a judicial determination of competency to refuse psychotropic drugs is the court's finding that LPS conservatees have this right by statute. The State attacks this conclusion on two fronts, arguing that (1) the qualified right of LPS conservatees to refuse medical treatment does not extend to psychiatric treatment, and (2) a consent decree in a federal suit concerning involuntary psychotropic medication at Napa State Hospital alone governs the rights of LPS conservatees in this field and does not afford a right to a judicial determination of competency.

a. The scope of LPS.

LPS scrupulously protects the rights of involuntarily detained mentally disordered persons. (See Welf. & Inst. Code, §§ 5325, 5327.)   The subclass of LPS conservatees is expressly afforded further rights.  (Welf. & Inst. Code, § 5357.)   Among these further rights is a qualified right to refuse or consent to medical treatment which is (1) related specifically to the conservatee' [178 Cal.App.3d 535] grave disability, or (2) necessary for the treatment of some other existing or continuing medical condition.  (Welf. & Inst. Code, § 5357, subd. (d) & (e) [conservatorship investigator's report shall recommend for or against deprivation of certain rights, including right to refuse or consent to medical treatment];  cf. *Board of Regents v. Davis* (1975) 14 Cal.3d 33, 42, 120 Cal.Rptr. 407, 533 P.2d 1047 [requirement in section 5357, subdivision (b), of recommendation for or against deprivation of conservatee's right to enter into contracts implicitly recognizes conservatee's right to contract].)

Under the present statutory scheme an LPS conservator can require the conservatee to receive medical treatment, but only if such treatment is authorized in the court order of conservatorship or in a subsequent court order (except in medical emergencies).  (Welf. & Inst. Code, §§ 5358, 5358.2.)   Accordingly, the Attorney General concluded in a 1977 opinion that under LPS "the conservatee is not divested of the right to make his or her own medical decisions *absent a specific determination by the court that the conservatee cannot make those decisions.*  In view of the fundamental nature of the right affected, the court should not make such a determination unless it finds that the conservatee lacks the mental capacity to rationally understand the nature of the medical problem, the proposed treatment and the attendant risks."  (60 Ops.Cal.Atty.Gen. 375, 377 (1977), emphasis added; see *Foy v. Greenblott* (1983) 141 Cal.App.3d 1, 11, 190 **\*751** Cal.Rptr. 84 To view preceding link please click here  [court may suspend conservatee's right to refuse medical treatment and authorize conservator to make

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)    **Page 5**

informed consent decisions].)

The State concedes the right of LPS conservatees to refuse medical treatment absent court authorization, but argues that this right does not extend to treatment of mental illnesses. The State relies on a 1976 letter from a deputy attorney general to a member of the California Assembly, explaining a 1975 Attorney General opinion written by the author of the letter. The 1975 opinion stated that "a conservatee is entitled, as a matter of privacy, to refuse necessary medical treatment absent a specific finding of incompetence or insanity by a superior court of this state...." (58 Ops.Cal.Atty.Gen. 849, 850-851 (1975).) The author stated in the 1976 letter that this opinion was not intended to imply a right to refuse psychiatric treatment.

At the time of the 1975 opinion, however, LPS (specifically section 5357) was "silent on the subject of consent to medical treatment." (58 Ops.Cal.Atty.Gen. 849 (1975).) For this reason the Attorney General's conclusion regarding the right to a judicial determination of competency was expressly founded on a *right of privacy.* (*Id.,* at p. 850.) In 1976 the relevant provisions of LPS were amended to address the subject of consent to [178 Cal.App.3d 536] medical treatment, specifically affording the right to refuse medical treatment absent a court order. (Welf. & Inst. Code, §§ 5357, 5358, 5358.2.)

The right afforded by the 1976 amendment expressly includes the "right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled." (Welf. & Inst. Code, § 5357, subd. (d).) "Grave disability" includes, in pertinent part, "A condition in which a person, as a result of a *mental disorder,* is unable to provide for his basic personal needs for food, clothing, or shelter...." (Welf. & Inst. Code, § 5008, subd. (h)(1), emphasis added.) Thus by affording a qualified right to refuse treatment related to being gravely disabled, LPS affords a right to refuse psychiatric treatment for the mental disorder causing the grave disability, absent a court order. The 1976 amendment to LPS supersedes the 1975 Attorney General opinion and explanatory 1976 letter. Indeed, the claimed exclusion of a right to refuse treatment for mental illness is conspicuously absent from the 1977 Attorney General opinion, which is based on the amended provisions of LPS. (60 Ops.Cal.Atty.Gen., *supra,* at p. 377.)

[2] In short, the trial court correctly determined that LPS conservatees have a right to refuse involuntary long-term psychotropic medication absent a judicial determination of their incompetency to do so.

b. The effect of the consent decree.

The State asserts that the rights of LPS conservatees regarding administration of psychotropic drugs are governed not by statute but by a 1983 consent decree in *Jamison v. Farabee* (N.D.Cal., No. 78-0445 WHO), a federal class action on behalf of adult patients at Napa State Hospital. The consent decree contains an agreement by the parties that the involuntary administration of antipsychotic medication to specified patients detained under LPS, including conservatees, violates their federal constitutional rights to due process. In order to protect this constitutional interest the parties agreed that Napa State Hospital would follow specified written procedures for the administration of antipsychotic medication. Under these procedures an "independent reviewer," who is a physician, is empowered to override a patient's refusal. There is no provision for a judicial determination of the patient's competency to refuse medication.

The trial court in the present case correctly held, however, that the consent decree does not address the *statutory* rights of patients detained under LPS. The sole stated purpose of the consent decree is to protect federal constitutional due process rights. The decree amounts to an agreement by the parties that the adopted "independent reviewer" system is adequate to protect those rights, and only those rights. The decree does not purport to [178 Cal.App.3d 537] afford **\*752** such independent review as a method of satisfying the statutory rights afforded by LPS. (FN7)

Moreover, even if Napa State Hospital patients have given up their statutory rights under LPS in favor of a nonjudicial system of independent review (which is debatable, given the absence of reference to LPS in the consent decree), there has been no such waiver by LPS conservatees statewide. (Cf. *Blue Chip Stamps v. Manor Drug Stores* (1975) 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 [nonparties cannot enforce consent decree even though they were intended beneficiaries].) More broadly speaking, if nonprisoners have a statutory right to a

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)          **Page 6**

judicial determination of competency to refuse psychotropic drugs, then prisoners cannot be said to have lost this right simply because patients in one mental health institution have agreed to alternative procedures as a method of satisfying their federal due process rights. (FN8)

    2. Rights of Adults Without Conservators.

    The trial court expressly declined to rule on the related issue whether adults without conservators have the right to a judicial determination of competency to refuse psychotropic drugs under the provisions of Probate Code sections 3200 et seq. [authorization of medical treatment for adults without conservators]. As further support for their position, however, the taxpayers contend that nonprisoners can be subjected to involuntary psychiatric treatment under these statutory provisions, and that such persons have a right to a judicial determination of competency, so that a similar right is available to prisoners under Penal Code section 2600.

    Probate Code sections 3200 et seq. provide for court authorization of "medical treatment" for an adult who has no conservator but is unable to give informed consent to needed medical treatment. Rendition of a court order requires, inter alia, a probability that a condition, if untreated, "will become life-endangering or result in a serious threat to the physical health of the patient." (Prob. Code, § 3208, subd. (a)(2).) The State and the Department of Mental Health as amicus curiae argue that these statutory provisions[178 Cal.App.3d 538] do not encompass treatment for mental illness, and therefore do not authorize long-term involuntary psychotropic medication.

    The dispute centers on Probate Code section 3211, which imposes limits on the authorization of medical treatment for adults without conservators. Subdivision (a) of section 3211 states, "No person may be placed in a mental health treatment facility under the provisions of this part." An Assembly committee comment states that section 3211 is "comparable" to Probate Code section 2356. (Legislative Committee com., 54A West's Ann.Prob.Code (1981 ed.) § 3211, p. 593.) Section 2356 imposes limits on the guardianship and conservatorship provisions of the Probate Code. Subdivision (a) of section 2356, like subdivision (a) of section 3211, states that a Probate Code ward or conservatee cannot be involuntarily "placed in a mental health treatment facility." Unlike section 3211, however, subdivision (a) of section 2356 further states that "involuntary civil mental health treatment" can occur only under LPS. The taxpayers in the present case contend that the absence of this latter provision from section 3211 demonstrates legislative intent to permit adults without conservators to be administered any involuntary mental health **\*753** treatment (upon court order) other than placement in a mental health facility.

    The interpretation urged by the taxpayers is logically sound, but there is a more likely explanation for exclusion of the pertinent language from section 3211, demonstrated by examination of two other limits set forth in sections 3211 and 2356.

    Subdivision (b) of section 2356 precludes the use of experimental drugs on a ward or conservatee under the pertinent provisions of the Probate Code, and further states that such drugs may be administered only under specified provisions of the Health and Safety Code. Subdivision (b) of section 3211 is a shorter version of its counterpart in section 2356; it precludes the use of experimental drugs under sections 3200 et seq., but omits the unnecessary additional language appearing in section 2356.

    Likewise, subdivision (c) of section 2356 precludes the use of convulsive treatment on a ward or conservatee under the Probate Code, and also states that such treatment may be performed only under LPS. Subdivision (c) of section 3211 is a shorter version, precluding convulsive treatment but omitting the unnecessary additional language in 2356.

    Thus subdivisions (b) and (c) of section 3211 are simply shortened versions of their counterparts in section 2356, abbreviated without substantive change.

    [178 Cal.App.3d 539] Similarly, subdivision (a) of section 2356 precludes placement in a mental health treatment facility under the Probate Code, and contains the further provision that "involuntary civil mental health treatment" may occur only under LPS. Subdivision (a) of section 3211, like subdivisions (b) and (c), precludes placement in a mental health treatment facility under sections 3200 et seq. but omits the further provision contained in section 2356. Thus the exclusion of the further language from subdivision (a) appears to be merely a

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)                    **Page 7**

nonsubstantive shortening device, as with subdivisions (b) and (c).

The problem is that unlike in subdivisions (b) and (c) of section 2356, the further provision in subdivision (a) of that statute refers to "involuntary civil mental health treatment" and thus varies from the prior reference to placement "in a mental health treatment facility." This variance leads to the statutory interpretation urged by the taxpayers.

It seems likely, however, given the nature of subdivisions (b) and (c) of sections 2356, that the two terms in subdivision (a) are carelessly used synonymously, and that, as with subdivisions (b) and (c), the further provision in subdivision (a) is intended simply to state that the proscribed measure is permitted only under other statutory authorization. The Legislature's interchangeable use of the phrases "placed in a mental health treatment facility" and "involuntary civil mental health treatment" can be explained by the fact that involuntary treatment would normally include placement in an institution, since as a practical matter it would be difficult to administer treatment involuntarily without contemporaneous institutionalization.

Leaving aside the comparative structure of sections 2356 and 3211, we cannot believe that the Legislature would take the major step of authorizing involuntary psychiatric treatment for adults without conservators merely by inference to be drawn from the variance between sections 3211 and 2356.

In any event, we need not decide this issue here. First, the trial court's decision was not based on sections 3200 et seq., and the injunction did not require adherence to any of those statutory procedures. Assuming the absence of a prison security threat, the right of LPS conservatees to a judicial determination of competency alone supported the judgment.

Second, assuming arguendo that adults without conservators may receive involuntary psychiatric treatment under sections 3200 et seq., such treatment clearly can occur only under court order. (Prob.Code, § 3201.) Thus, as it pertains to the present case, this statutory scheme is either completely irrelevant (not authorizing involuntary psychiatric treatment at all) or is further **\*754** support for requiring a judicial determination of competency (requiring a court order for involuntary treatment).

[178 Cal.App.3d 540] 3. Constitutional and Common Law Rights.

The taxpayers also argue, and the trial court held, that nonprisoners have a constitutional and common law right to a judicial determination of competency before they can be subjected to involuntary long-term psychotropic medication.

It is settled in California that every person has a right to give or withhold informed consent to a proposed medical treatment, under both the state constitutional guarantee of privacy (*Foy v. Greenblott, supra,* 141 Cal.App.3d at p. 11, 190 Cal.Rptr. 84) and the common law (*id.; Cobbs v. Grant* (1972) 8 Cal.3d 229, 242-244, 104 Cal.Rptr. 505, 502 P.2d 1). No California appellate court, however, has addressed the question whether there is a concomitant constitutional or common law right to a judicial determination of competency before the right to refuse treatment is infringed.

The few cases on this point in other jurisdictions are in conflict.

The federal approach seems to be one of deference to professional judgment. The court in *Rennie v. Klein* (3d Cir.1983) 720 F.2d 266 held that the decision of a mental health professional to administer psychotropic drugs to an involuntarily committed patient "will be presumed valid unless it is shown to be a 'substantial departure from accepted professional judgment, practice or standards.' " (*Id.,* at p. 269, quoting *Youngberg v. Romeo* (1982) 457 U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28.) This holding was based on the opinion of the United States Supreme Court in *Youngberg* (not a drug case). *Youngberg* held that under the federal Constitution, in determining whether the state has adequately protected an involuntarily committed patient's rights (specifically to safe conditions of confinement, freedom from bodily restraints, and habilitation), a challenged decision made by a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)          **Page 8**

responsible actually did not base the decision on such a judgment." (457 U.S. at p. 323, 102 S.Ct. at p. 2462.) (FN9)

In contrast, several state courts have held, on constitutional, common law, and statutory grounds, that public mental health professionals cannot forcibly administer psychotropic drugs to involuntarily committed patients without a judicial determination of incompetency to make treatment decisions. (*Goedecke v. State, Dept. of Institutions* (1979), 198 Colo. 407, 603 P.2d 123, 125 [based [178 Cal.App.3d 541] on common law and statute]; *In re K.K.B.* (Okla.1980) 609 P.2d 747, 751-752 [constitutional right to privacy]; *Rogers v. Com'r of Dept. of Mental Health* (1983) 390 Mass. 489, 458 N.E.2d 308, 314 [constitutional right to privacy, common law, and statute]; see *Guardianship of Roe* (1981) 383 Mass. 415, 421 N.E.2d 40, 51, & fn. 9 [guardian of noninstitutionalized mentally ill person cannot consent to forcible administration of antipsychotic medication absent court order; based on constitutional right to privacy, inherent power of courts, and common law].) (FN10)

We need not decide, however, whether there is a constitutional or common law **\*755** right to a judicial determination of competency, because that right is provided by statute in California, under LPS. (Cf. *Goedecke v. State, Dept. of Institutions, supra,* 603 P.2d at p. 124 [no need to decide constitutional issues because state common law and statute afforded right to judicial hearing on competency].)

As a practical matter, as well as by implication from the statutes authorizing involuntary treatment, no involuntary treatment of any kind can take place outside the confines of the statutory guardianship and conservatorship mechanisms. Wards and conservatees under the Probate Code are expressly protected from involuntary civil mental health treatment. (Prob.Code, § 2356; compare *Guardianship of Roe, supra,* 383 Mass. 415, 421 N.E.2d 40 [noninstitutionalized mentally ill person could receive forcible antipsychotic medication under court order].) Assuming arguendo that adults without conservators may receive involuntary psychiatric treatment under Probate Code sections 3200 et seq.--which is doubtful--such treatment clearly can occur only under court order. (Prob.Code, § 3201.) This leaves LPS, which appears to provide the sole mechanism for involuntary administration of long-term psychotropic medication, and also requires a court determination of incompetency.

[3] Thus, regardless of constitutional and common law ramifications, nonprisoners in California have a statutory right to refuse long-term treatment with psychotropic drugs absent a judicial determination that they are incompetent to do so. (FN11)

[178 Cal.App.3d 542] C. *Sufficiency of the Evidence.*

Having concluded nonprisoners have a statutory right to a judicial determination of competency, our only remaining inquiry under Penal Code section 2600 is whether denial of this right to prisoners is necessary to prison security. (FN12)

The trial court found that attendance of prisoners at judicial hearings on their competency to refuse treatment with psychotropic drugs would not threaten prison security. This determination was supported by substantial evidence. The transportation sergeant at CMF testified that he could safely transport prisoners to the superior court in Fairfield for competency proceedings. A former CMF custodial officer testified that handcuffs have been sufficient to secure nonobjecting prisoners attending the present institutional review proceedings; belly chains and leg irons have been used if necessary. (FN13) A former director of Napa State Hospital testified that court hearings for Napa patients did not create any security problems there.

Because substantial evidence supported the court's determination that there would be no threat to prison security, that determination cannot be disturbed on appeal. (FN14)

IV. Conclusion

[4] We conclude that state prisoners, like nonprisoners under the LPS statutory scheme, are entitled to a judicial determination **\*756.** of their competency to refuse treatment before they can be subjected to long-term involuntary psychotropic medication. Mental health professionals and prison administrators may find this requirement cumbersome, but this is a price of life in a free society. Forced drugging is one of the earmarks of the gulag. It

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)          **Page 9**

should be permitted in state institutions only after adherence to stringent substantive and procedural safeguards.

[178 Cal.App.3d 543] The judgment is affirmed.

LOW, P.J., and HANING, J., concur.

(FN1.) These include thorazine, prolixin, stelazine, serentil, quide, tindal, compazine, trilafon, repoise, mellaril, tractan, navane, haldol, moban, and vesprin.

(FN2.) Thus the demeanor often associated with mental illness--shuffling gait, rigid body movements, restlessness, and staring--may be caused by medication rather than by the illness itself.  (See California Conservatorships (CEB 2d ed. 1983) § 8.50, p. 541.)

(FN3.) At oral argument the parties agreed that "long term" medication within the context of the issues before us is interpreted as medication in excess of 10 days.

(FN4.) In a 1979 unpublished opinion Division Four of this court affirmed the judgment of dismissal as to Keyhea but held the taxpayers had standing to proceed with the remainder of the action.  (*Keyhea v. Enomoto* (Dec. 21, 1979) 1 Civ. 45908.)

(FN5.) We are not deciding, nor did the trial judge, that all provisions of the LPS statutory scheme apply to prisoners.  The judgment specified Welfare and Institutions Code sections 5350 [procedure for one-year conservatorship] and 5358.2 [requiring court order for medical treatment of conservatee] and Probate Code sections 1471 [requiring appointment of legal counsel for Probate Code conservatee] and 1825 [requiring attendance of proposed conservatee at conservatorship hearing].  The State argues that the inclusion of section 5350 gives prisoners a right to a jury trial;  however, it never sought clarification of this issue from the trial court.  We note that the right to a jury trial under section 5350, subdivision (c), was not specifically granted by the trial court in its statement of decision or its judgment.  That statutory right is for determination of the issue of whether a proposed conservatee is gravely disabled.

(FN6.) The other rights enumerated in section 2600 are the rights to inherit, own, sell, or convey real or personal property;  to correspond with attorneys and public officers;  to read printed materials;  to have personal visits;  to initiate civil actions;  to marry;  to create a power of appointment;  and to make a will.  (Pen.Code, § 2601, subd. (a)-(h).)

(FN7.) The State argues that the plaintiffs' pleadings in *Jamison* asserted there is no right under LPS to a judicial determination of competency to refuse psychotropic drugs.  But this assertion by the plaintiffs (which may reflect certain tactical considerations) constituted no more than one side's theory of the litigation.  This theory does not appear in the consent decree, and even if it did it would not be stare decisis because there has been no appellate decision.  (See 9 Witkin, Cal. Procedure (3d ed. 1985), Appeal, § 763, p. 730.)

(FN8.) If the Legislature decides to adapt an alternative statutory scheme for long-term treatment of prisoners with psychotropic drugs, it will undoubtedly give due consideration to the procedure set forth in the consent decree in *Jamison.*

(FN9.) For a detailed discussion of the uncertain development of the federal approach, see *Right to Refuse, supra,* at pp. 122-132.)

(FN10.) The requirement of a judicial determination falls within the rubric of "judicial model for factfinding" (see *Parham v. J.R.* (1979) 442 U.S. 584, 608, fn. 16, 99 S.Ct. 2493, 2507, fn. 16, 61 L.Ed.2d 101), which one commentator terms the "political charter" (control of state provision of professional services by political processes).  (*Mental Hospital Drugs, supra,* at pp. 1730-1731.)  This commentator characterizes the rule of deference to professional judgment--the "administrative model"--as the "professional charter" (control of state provision of professional services by professional norms and practices).  (*Mental Hospital Drugs, supra,* at pp. 1730-1731.)

© 2005 Thomson/West. No claim to original U.S. Govt. works.

223 Cal.Rptr. 746, 178 Cal.App.3d 526, Keyhea v. Rushen, (Cal.App. 1 Dist. 1986)        **Page 10**

(FN11.) In other words, our Legislature has selected the "judicial model" or "political charter." (See *ante,* fn. 10.)   Nothing in this opinion should be construed as deciding the issue whether the Legislature can or cannot constitutionally adopt the administrative model for state prisoners.

**\*756**_ (FN12.) Public safety is not an issue here.

(FN13.) The chairman of the review board testified there is no need at all for chains and handcuffs for the types of prisoners who are "objecting verbally while they hold out their arm to get the shot."

(FN14.) The State also challenges the court's injunction to the extent it afforded certain procedural protections under LPS for persons to be subjected to involuntary medication for more than 14 days, including "the procedural protections provided non-prisoners of notice, judicial hearing, and judicial determination, personal appearance, and assistance of counsel specified in the Lanterman-Petris-Short Act, Welfare and Institutions Code §§ 5350 and 5358.2 and Probate Code §§ 1471 and 1825."   The State argues that LPS and Penal Code section 2600 do not compel these procedural protections.  But these protections are to be implied from the right to a judicial determination of competency and are a necessary and integral part of that right.  To divorce these protections from the right to a court determination of competency would deprive that right of any meaningful significance.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

120 S.Ct. 2348, 530 U.S. 466, Apprendi v. New Jersey, (U.S.N.J. 2000)                    **Page 1**

**\*2348** 120 S.Ct. 2348

530 U.S. 466, 147 L.Ed.2d 435, 68 USLW
4576, 12 Fed.Sent.R. 307,

Cal. Daily Op. Serv. 5061,

2000 Daily Journal D.A.R. 6749, 2000 CJ
C.A.R. 3722,

13 Fla. L. Weekly Fed. S 457

Supreme Court of the United States

**Charles C. APPRENDI, Jr., Petitioner,**
**v.**
**NEW JERSEY.**

**No. 99-478.**
Argued March 28, 2000.

Decided June 26, 2000.

Defendant was convicted pursuant to guilty plea in the Superior Court, Law Division, Cumberland County, of possession of firearm for unlawful purpose and unlawful possession of prohibited weapon, and defendant was sentenced to extended term under New Jersey's hate crime statute. Defendant appealed. The Superior Court, Appellate Division, 304 N.J.Super. 147, 698 A.2d 1265, affirmed. Defendant appealed. The New Jersey Supreme Court, 159 N.J. 7, 731 A.2d 485, affirmed. Upon granting certiorari, the United States Supreme Court, Justice Stevens, held that: (1) other than fact of prior conviction, any fact that increases penalty for crime beyond prescribed statutory maximum must be submitted to jury and proved beyond reasonable doubt, and (2) state hate crime statute which authorized increase in maximum prison sentence based on judge's finding by preponderance of evidence that defendant acted with purpose to intimidate victim based on particular characteristics of victim violated due process clause.

Reversed and remanded.

Justice Scalia filed concurring opinion.

Justice Thomas filed concurring opinion in which Justice Scalia joined in part.

Justice O'Connor filed dissenting opinion in which Chief Justice Rehnquist and Justices Kennedy and Breyer joined.

Justice Breyer filed dissenting opinion in which Chief Justice Rehnquist joined.

West Headnotes

[1] Criminal Law ☞561(1)

110 ----
110XVII Evidence
110XVII(V) Weight and Sufficiency
110k561 Reasonable Doubt
110k561(1) In General.

[See headnote text below]

[1] Jury ☞34(2)

230 ----
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k34 Restriction or Invasion of Functions of Jury
230k34(2) Weight and Sufficiency of Evidence.

Criminal defendant is entitled to jury determination that he is guilty of every element of crime with which he is charged, beyond reasonable doubt. U.S.C.A. Const.Amends. 6, 14.

[2] Criminal Law ☞561(1)

110 ----
110XVII Evidence
110XVII(V) Weight and Sufficiency
110k561 Reasonable Doubt
110k561(1) In General.

Criminal defendant has right to have jury verdict based on proof beyond reasonable doubt.

[3] Sentencing and Punishment ☞201

350H ----
350HII Sentencing Proceedings in General
350HII(A) In General
350Hk201 Duties of Court or Judge in General.

(Formerly 110k977(1))

Judge's role in sentencing is constrained at its outer limits by facts alleged in indictment and found by jury.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

120 S.Ct. 2348, 530 U.S. 466, Apprendi v. New Jersey, (U.S.N.J. 2000)                    **Page 2**

[4] Jury ☜34(6)

   230 ----
     230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
      230k34 Restriction or Invasion of Functions
      of Jury
      230k34(5) Sentencing Matters
    230k34(6) In General.

   (Formerly 230k34(1), 350Hk329, 110k1208.6(5))

   [See headnote text below]

[4] Sentencing and Punishment ☜322

   350H ----
     350HII Sentencing Proceedings in General
     350HII(F) Evidence
     350Hk322 Degree of Proof.

   (Formerly 110k749)

  Other than the fact of prior conviction, any fact that
increases penalty for crime beyond prescribed
statutory maximum must be submitted to jury, and
proved beyond reasonable doubt.

[5] Jury ☜34(6)

   230 ----
     230II Right to Trial by Jury
     230k30 Denial or Infringement of Right
     230k34 Restriction or Invasion of Functions
     of Jury
     230k34(5) Sentencing Matters
    230k34(6) In General.

   (Formerly 230k34(1), 110k749)

   [See headnote text below]

[5] Sentencing and Punishment ☜322

   350H ----
     350HII Sentencing Proceedings in General
     350HII(F) Evidence
     350Hk322 Degree of Proof.

   (Formerly 110k1208.6(5))

  It is unconstitutional for legislature to remove from
jury the assessment of facts, other than the fact of
prior conviction, that increase prescribed range of
penalties to which criminal defendant is exposed, and

such facts must be established by proof beyond
reasonable doubt. U.S.C.A. Const.Amend. 14.

[6] Civil Rights ☜1805

   78 ----
     78VI Offenses and Penalties
     78k1802 Constitutional and Statutory
     Provisions
     78k1805 Power to Enact and Validity.

   (Formerly 78k472.1)

   [See headnote text below]

[6] Constitutional Law ☜270(1)

   92 ----
     92XII Due Process of Law
     92k256 Criminal Prosecutions
     92k270 Judgment and Sentence
     92k270(1) In General.

   [See headnote text below]

[6] Sentencing and Punishment ☜206

   350H ----
     350HII Sentencing Proceedings in General
     350HII(A) In General
     350Hk203 Constitutional, Statutory and Other
     Regulatory Provisions
     350Hk206 Validity.

   (Formerly 350Hk8, 110k1206.1(1))

  New Jersey hate crime statute which allowed judge
to make factual determination, based on
preponderance of evidence, which would increase
maximum sentence of defendant convicted of second
degree offense of unlawful possession of prohibited
weapon from ten to 20 years, thereby imposing
punishment identical to that state imposed for first
degree crime, violated due process; due process
clause required such factual determinations to be
made by jury on basis of proof beyond reasonable
doubt. U.S.C.A. Const.Amend. 14; N.J.S.A.
2C:43-6, subd. a(1), 2C:43-7, subd. a(3), 2C:44-3,
subd. e.

[7] Criminal Law ☜568

   110 ----
     110XVII Evidence
     110XVII(V) Weight and Sufficiency

© 2007 Thomson/West. No claim to original U.S. Govt. works.

120 S.Ct. 2348, 530 U.S. 466, Apprendi v. New Jersey, (U.S.N.J. 2000)    **Page 3**

110k568 Elements of Offenses in General.

Relevant inquiry in determining whether finding is essential element of offense which must be decided by jury beyond reasonable doubt is one not of form, but of effect, namely whether required finding exposes defendant to greater punishment than that authorized by jury's guilty verdict.

[8] Civil Rights ☞1808

78 ----
   78VI Offenses and Penalties
      78k1808 Offenses.

   (Formerly 78k472.1)

[See headnote text below]

[8] Jury ☞34(6)

230 ----
   230II Right to Trial by Jury
      230k30 Denial or Infringement of Right
         230k34 Restriction or Invasion of Functions of Jury
            230k34(5) Sentencing Matters
230k34(6) In General.

   (Formerly 230k34(1), 350Hk329, 110k1208.6(1))

[See headnote text below]

[8] Sentencing and Punishment ☞322

350H ----
   350HII Sentencing Proceedings in General
      350HII(F) Evidence
         350Hk322 Degree of Proof.

   (Formerly 110k1208.6(1))

Mere fact that state legislature placed its hate crime sentence enhancer within sentencing provisions of criminal code does not mean that finding of biased purpose to intimidate which is required for hate crime sentence enhancement is not essential element of offense which must be decided by jury beyond reasonable doubt. N.J.S.A. 2C:43-6, subd. a(1), 2C:43-7, subd. a(3), 2C:44-3, subd. e.

West Codenotes

Held Unconstitutional

N.J.Stat.Ann. § 2c:44-3(e)

*2349 Syllabus (FN*)

Petitioner Apprendi fired several shots into the home of an African-American family and made a statement--which he later retracted--that he did not want the family in his neighborhood because of their race. He was charged under New Jersey law with, *inter alia,* second-degree possession of a firearm for an unlawful purpose, which carries a prison term of 5 to 10 years. The count did not refer to the State's hate crime statute, which provides for an enhanced sentence if a trial judge finds, by a preponderance of the evidence, that the defendant committed the crime **\*2350** with a purpose to intimidate a person or group because of, *inter alia,* race. After Apprendi pleaded guilty, the prosecutor filed a motion to enhance the sentence. The court found by a preponderance of the evidence that the shooting was racially motivated and sentenced Apprendi to a 12-year term on the firearms count. In upholding the sentence, the appeals court rejected Apprendi's claim that the Due Process Clause requires that a bias finding be proved to a jury beyond a reasonable doubt. The State Supreme Court affirmed.

*Held:* The Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. Pp. 2354-2366.

(a) The answer to the narrow constitutional question presented--whether Apprendi's sentence was permissible, given that it exceeds the 10-year maximum for the offense charged--was foreshadowed by the holding in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311, that, with regard to federal law, the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees require that any fact other than prior conviction that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt. The Fourteenth Amendment commands the same answer when a state statute is involved. Pp. 2354-2355.

(b) The Fourteenth Amendment right to due process and the Sixth Amendment right to trial by jury, taken together, entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. *E.g., In re Winship,* 397 U.S.

© 2007 Thomson/West. No claim to original U.S. Govt. works.

120 S.Ct. 2348, 530 U.S. 466, Apprendi v. New Jersey, (U.S.N.J. 2000)    **Page 4**

358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368. The historical foundation for these principles extends down centuries into the common law. While [530 U.S. 467] judges in this country have long exercised discretion in sentencing, such discretion is bound by the range of sentencing options prescribed by the legislature. See, *e.g., United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 30 L.Ed.2d 592. The historic inseparability of verdict and judgment and the consistent limitation on judges' discretion highlight the novelty of a scheme that removes the jury from the determination of a fact that exposes the defendant to a penalty exceeding the maximum he could receive if punished according to the facts reflected in the jury verdict alone. Pp. 2355-2360.

(c) *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67, was the first case in which the Court used "sentencing factor" to refer to a fact that was not found by the jury but could affect the sentence imposed by the judge. In finding that the scheme at issue there did not run afoul of *Winship's* strictures, this Court did not budge from the position that (1) constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense, 477 U.S., at 85-88, 106 S.Ct. 2411, and (2) a state scheme that keeps from the jury facts exposing defendants to greater or additional punishment may raise serious constitutional concerns, *id.,* at 88, 106 S.Ct. 2411. *Almendarez-Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350--in which the Court upheld a federal law allowing a judge to impose an enhanced sentence based on prior convictions not alleged in the indictment--represents at best an exceptional departure from the historic practice. Pp. 2360-2363.

(d) In light of the constitutional rule expressed here, New Jersey's practice cannot stand. It allows a jury to convict a defendant of a second-degree offense on its finding beyond a reasonable doubt and then allows a judge to impose punishment identical to that New Jersey provides for first-degree crimes on his finding, by a preponderance of the evidence, that the defendant's purpose was to intimidate his **\*2351** victim based on the victim's particular characteristic. The State's argument that the biased purpose finding is not an "element" of a distinct hate crime offense but a "sentencing factor" of motive is nothing more than a disagreement with the rule applied in this case. Beyond this, the argument cannot succeed on its own terms. It does not matter how the required finding is labeled, but whether it exposes the defendant to a greater punishment than that

authorized by the jury's verdict, as does the sentencing "enhancement" here. The degree of culpability the legislature associates with factually distinct conduct has significant implications both for a defendant's liberty and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment. That the State placed the enhancer within the criminal code's sentencing provisions does not mean that it is not an essential element of the offense. Pp. 2363-2366.

159 N.J. 7, 731 A.2d 485, reversed and remanded.

[530 U.S. 468] STEVENS, J., delivered the opinion of the Court, in which SCALIA, SOUTER, THOMAS, and GINSBURG, JJ., joined. SCALIA, J., filed a concurring opinion, *post,* p. 2367. THOMAS, J., filed a concurring opinion, in which SCALIA, J., joined as to Parts I and II, *post,* p. 2367. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C.J., and KENNEDY and BREYER, JJ., joined, *post,* p. 2380. BREYER, J., filed a dissenting opinion, in which REHNQUIST, C.J., joined, *post,* p. 2396.

Joseph D. O'Neill and Charles I. Coant, Vineland, NJ, for petitioner.

Lisa S. Gochman, Trenton, NJ, for respondent.

Edward C. DuMont, for United States as amicus curiae, by special leave of the Court.

For U.S. Supreme Court briefs, see:

2000 WL 35843 (Pet.Brief)

2000 WL 177168 (Resp.Brief)

2000 WL 297724 (Reply.Brief)

Justice STEVENS delivered the opinion of the Court.

A New Jersey statute classifies the possession of a firearm for an unlawful purpose as a "second-degree" offense. N.J. Stat. Ann. § 2C:39-4(a) (West 1995). Such an offense is punishable by imprisonment for "between five years and 10 years." § 2C:43-6(a)(2). A separate statute, described by that State's Supreme Court as a "hate crime" law, provides for an "extended term" of imprisonment if the trial judge finds, by a preponderance of the evidence, that "[t]he defendant[530 U.S. 469] in committing the crime acted with a purpose to

© 2007 Thomson/West. No claim to original U.S. Govt. works.

intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." N.J. Stat. Ann. § 2C:44-3(e) (West Supp. 1999-2000). The extended term authorized by the hate crime law for second-degree offenses is imprisonment for "between 10 and 20 years." § 2C:43-7(a)(3).

The question presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt.

I

At 2:04 a.m. on December 22, 1994, petitioner Charles C. Apprendi, Jr., fired several .22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood in Vineland, New Jersey. Apprendi was promptly arrested and, at 3:05 a.m., admitted that he was the shooter. After further questioning, at 6:04 a.m., he made a statement--which he later retracted--that even though he did not know the occupants of the house personally, "because they are black in color he does not want them in the neighborhood." 159 N.J. 7, 10, 731 A.2d 485, 486 (1999).

**\*2352** A New Jersey grand jury returned a 23-count indictment charging Apprendi with four first-degree, eight second-degree, six third-degree, and five fourth-degree offenses. The charges alleged shootings on four different dates, as well as the unlawful possession of various weapons. None of the counts referred to the hate crime statute, and none alleged that Apprendi acted with a racially biased purpose.

The parties entered into a plea agreement, pursuant to which Apprendi pleaded guilty to two counts (3 and 18) of second-degree possession of a firearm for an unlawful purpose,[530 U.S. 470] N.J. Stat. Ann. § 2C:39-4a (West 1995), and one count (22) of the third-degree offense of unlawful possession of an antipersonnel bomb, § 2C:39-3a; the prosecutor dismissed the other 20 counts. Under state law, a second-degree offense carries a penalty range of 5 to 10 years, § 2C:43-6(a)(2); a third-degree offense carries a penalty range of between 3 and 5 years, § 2C:43-6(a)(3). As part of the plea agreement, however, the State reserved the right to request the court to impose a higher "enhanced" sentence on

count 18 (which was based on the December 22 shooting) on the ground that that offense was committed with a biased purpose, as described in § 2C:44-3(e). Apprendi, correspondingly, reserved the right to challenge the hate crime sentence enhancement on the ground that it violates the United States Constitution.

At the plea hearing, the trial judge heard sufficient evidence to establish Apprendi's guilt on counts 3, 18, and 22; the judge then confirmed that Apprendi understood the maximum sentences that could be imposed on those counts. Because the plea agreement provided that the sentence on the sole third-degree offense (count 22) would run concurrently with the other sentences, the potential sentences on the two second-degree counts were critical. If the judge found no basis for the biased purpose enhancement, the maximum consecutive sentences on those counts would amount to 20 years in aggregate; if, however, the judge enhanced the sentence on count 18, the maximum on that count alone would be 20 years and the maximum for the two counts in aggregate would be 30 years, with a 15-year period of parole ineligibility.

After the trial judge accepted the three guilty pleas, the prosecutor filed a formal motion for an extended term. The trial judge thereafter held an evidentiary hearing on the issue of Apprendi's "purpose" for the shooting on December 22. Apprendi adduced evidence from a psychologist and from seven character witnesses who testified that he did not [530 U.S. 471] have a reputation for racial bias. He also took the stand himself, explaining that the incident was an unintended consequence of overindulgence in alcohol, denying that he was in any way biased against African-Americans, and denying that his statement to the police had been accurately described. The judge, however, found the police officer's testimony credible, and concluded that the evidence supported a finding "that the crime was motivated by racial bias." App. to Pet. for Cert. 143a. Having found "by a preponderance of the evidence" that Apprendi's actions were taken "with a purpose to intimidate" as provided by the statute, *id.,* at 138a, 139a, 144a, the trial judge held that the hate crime enhancement applied. Rejecting Apprendi's constitutional challenge to the statute, the judge sentenced him to a 12-year term of imprisonment on count 18, and to shorter concurrent sentences on the other two counts.

Apprendi appealed, arguing, *inter alia,* that the Due Process Clause of the United States Constitution

© 2007 Thomson/West. No claim to original U.S. Govt. works.

requires that the finding of bias upon which his hate crime sentence was based must be proved to a jury beyond a reasonable doubt, *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Over dissent, the Appellate Division of the Superior Court of New Jersey upheld the enhanced sentence. **\*2353** 304 N.J.Super. 147, 698 A.2d 1265 (1997). Relying on our decision in *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), the appeals court found that the state legislature decided to make the hate crime enhancement a "sentencing factor," rather than an element of an underlying offense--and that decision was within the State's established power to define the elements of its crimes. The hate crime statute did not create a presumption of guilt, the court determined, and did not appear " 'tailored to permit the ... finding to be a tail which wags the dog of the substantive offense.' " 304 N.J.Super., at 154, 698 A.2d, at 1269 (quoting *McMillan,* 477 U.S., at 88, 106 S.Ct. 2411). Characterizing the required finding as one of "motive," the court described it as a traditional "sentencing factor," one not considered an "essential [530 U.S. 472] element" of any crime unless the legislature so provides. 304 N.J.Super., at 158, 698 A.2d, at 1270. While recognizing that the hate crime law did expose defendants to " 'greater and additional punishment,' " *id.,* at 156, 698 A.2d, at 1269 (citing *McMillan,* 477 U.S., at 88, 106 S.Ct. 2411), the court held that that "one factor standing alone" was not sufficient to render the statute unconstitutional, 307 N.J.Super., at 156, 698 A.2d, at 1269.

A divided New Jersey Supreme Court affirmed. 159 N.J. 7, 731 A.2d 485 (1999). The court began by explaining that while due process only requires the State to prove the "elements" of an offense beyond a reasonable doubt, the mere fact that a state legislature has placed a criminal component "within the sentencing provisions" of the criminal code "does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense." *Id.,* at 20, 731 A.2d, at 492. "Were that the case," the court continued, "the Legislature could just as easily allow judges, not juries, to determine if a kidnapping victim has been released unharmed." *Ibid.* (citing state precedent requiring such a finding to be submitted to a jury and proved beyond a reasonable doubt). Neither could the constitutional question be settled simply by defining the hate crime statute's "purpose to intimidate" as "motive" and thereby excluding the provision from any traditional conception of an "element" of a crime. Even if one could characterize the language this way--and the

court doubted that such a characterization was accurate--proof of motive did not ordinarily "increase the penal consequences to an actor." *Ibid.* Such "[l]abels," the court concluded, would not yield an answer to Apprendi's constitutional question. *Ibid.*

While noting that we had just last year expressed serious doubt concerning the constitutionality of allowing penalty-enhancing findings to be determined by a judge by a preponderance of the evidence, *Jones v. United States,* 526 U.S. [530 U.S. 473] 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) To view preceding link please click here , the court concluded that those doubts were not essential to our holding. Turning then, as the appeals court had, to *McMillan,* as well as to *Almendarez-Torres v. United States,* 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the court undertook a multifactor inquiry and then held that the hate crime provision was valid. In the majority's view, the statute did not allow impermissible burden shifting, and did not "create a separate offense calling for a separate penalty." 159 N.J., at 24, 731 A.2d, at 494. Rather, "the Legislature simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor." *Ibid.,* 731 A.2d, at 494-495. As had the appeals court, the majority recognized that the state statute was unlike that in *McMillan* inasmuch as it increased the maximum penalty to which a defendant could be subject. But it was not clear that this difference alone would "change the constitutional calculus," especially where, as here, "there is rarely any doubt whether the defendants committed the crimes with the purpose of intimidating the victim on the basis of race or ethnicity." 159 N.J., at 24-25, 731 A.2d, at 495. To view preceding link please click here Moreover, in light of concerns "idiosyncratic" to hate crime statutes drawn carefully to avoid "punishing thought itself," the enhancement served as an appropriate balance between those concerns and the State's compelling interest in vindicating the right "to be free of invidious discrimination." *Id.,* at 25-26, 731 A.2d, at 495.

The dissent rejected this conclusion, believing instead that the case turned on two critical characteristics: (1) "[A] defendant's mental state in committing the subject offense ... necessarily involves a finding so integral to the charged offense that it must be characterized as an element thereof"; and (2) "the significantly increased sentencing range triggered by ... the finding of a purpose to

© 2007 Thomson/West. No claim to original U.S. Govt. works.

intimidate" means that the purpose "must be treated as a material element [that] must be found by a jury beyond a reasonable doubt." [530 U.S. 474] *Id.,* at 30, 731 A.2d, at 498. In the dissent's view, the facts increasing sentences in both *Almendarez-Torres* (recidivism) and *Jones* (serious bodily injury) were quite distinct from New Jersey's required finding of purpose here; the latter finding turns directly on the conduct of the defendant during the crime and defines a level of culpability necessary to form the hate crime offense. While acknowledging "analytical tensions" in this Court's post-*Winship* jurisprudence, the dissenters concluded that "there can be little doubt that the sentencing factor applied to this defendant--the purpose to intimidate a victim because of race--must fairly be regarded as an element of the crime requiring inclusion in the indictment and proof beyond a reasonable doubt." 159 N.J., at 51, 731 A.2d, at 512.

We granted certiorari, 528 U.S. 1018, 120 S.Ct. 525, 145 L.Ed.2d 407 (1999), and now reverse.

## II

It is appropriate to begin by explaining why certain aspects of the case are not relevant to the narrow issue that we must resolve. First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. Brief for Respondent 4. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased--indeed, it doubled--the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

[530 U.S. 475] Second, although the constitutionality of basing an enhanced sentence on racial bias was argued in the New Jersey courts, that issue was not raised here. (FN1) The substantive basis for New Jersey's enhancement is thus not at issue; the adequacy of New Jersey's procedure is. The strength of the state interests that are served by the hate crime legislation has no more bearing on this procedural question than the strength of the interests served by other provisions of the criminal code.

Third, we reject the suggestion by the State Supreme Court that "there is rarely any doubt" concerning the existence of the biased purpose that will support an enhanced sentence, 159 N.J., at 25, 731 A.2d, **\*2355** at 495. To view preceding link please click here In this very case, that issue was the subject of the full evidentiary hearing we described. We assume that both the purpose of the offender, and even the known identity of the victim, will sometimes be hotly disputed, and that the outcome may well depend in some cases on the standard of proof and the identity of the factfinder.

Fourth, because there is no ambiguity in New Jersey's statutory scheme, this case does not raise any question concerning the State's power to manipulate the prosecutor's burden of proof by, for example, relying on a presumption rather than evidence to establish an element of an offense, cf. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), or by placing the affirmative defense label on "at least some elements" of traditional crimes, *Patterson v. New York,* 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). The prosecutor did not invoke any presumption to buttress the evidence of racial bias and did not claim that Apprendi had the burden of disproving an improper motive. The question whether Apprendi had a constitutional right to [530 U.S. 476] have a jury find such bias on the basis of proof beyond a reasonable doubt is starkly presented.

Our answer to that question was foreshadowed by our opinion in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), construing a federal statute. We there noted that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.,* at 243, n. 6, 119 S.Ct. 1215. The Fourteenth Amendment commands the same answer in this case involving a state statute.

## III

In his 1881 lecture on the criminal law, Oliver Wendell Holmes, Jr., observed: "The law threatens

© 2007 Thomson/West. No claim to original U.S. Govt. works.

certain pains if you do certain things, intending thereby to give you a new motive for not doing them. If you persist in doing them, it has to inflict the pains in order that its threats may continue to be believed." (FN2) New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect Apprendi from unwarranted pains should apply equally to the two acts that New Jersey has singled out for punishment. Merely using the label "sentence enhancement" to describe the latter surely does not provide a principled basis for treating them differently.

[1] At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without "due process of law," Amdt. 14, and the guarantee that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial[530 U.S. 477] jury," Amdt. 6. (FN3) Taken **\*2356** together, these rights indisputably entitle a criminal defendant to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995); see also *Sullivan v. Louisiana,* 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); *Winship,* 397 U.S., at 364, 90 S.Ct. 1068 ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged").

As we have, unanimously, explained, *Gaudin,* 515 U.S., at 510-511, 115 S.Ct. 2310, the historical foundation for our recognition of these principles extends down centuries into the common law. "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours...." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added). See also *Duncan v.*

*Louisiana,* 391 U.S. 145, 151-154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

[2] [530 U.S. 478] Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. "The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence § 321, pp. 681-682 (1954); see also 9 J. Wigmore, Evidence § 2497 (3d ed.1940)." *Winship,* 397 U.S., at 361, 90 S.Ct. 1068. We went on to explain that the reliance on the "reasonable doubt" standard among common-law jurisdictions " 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.' " *Id.,* at 361-362, 90 S.Ct. 1068 (quoting *Duncan,* 391 U.S., at 155, 88 S.Ct. 1444).

Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court (FN4) as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offence, ... stated with such certainty and precision, that the defendant ... may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly ... and *that there may be no doubt as to the judgment which should be given,* if the defendant be convicted." J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862) (emphasis added). The defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime. See 4 Blackstone[530 U.S. 479] 369-370 (after verdict, and barring a defect in the indictment, pardon, or benefit of clergy, "the court *must pronounce that judgment, which the law hath annexed to the crime* " (emphasis added)).

**\*2357** Thus, with respect to the criminal law of felonious conduct, "the English trial judge of the later eighteenth century had very little explicit discretion in sentencing. The substantive criminal law tended to be sanction-specific; it prescribed a

© 2007 Thomson/West. No claim to original U.S. Govt. works.